**KAMENAR RAILROAD SALVAGE, INC., Appellant,**

v.

**OHIO EDISON COMPANY et al., Appellees.**

[Cite as *Kamenar RR. Salvage, Inc. v. Ohio Edison Co.* (1992), 79 Ohio App.3d 685.]

Court of Appeals of Ohio,
Union County.

No. 14–91–41.

Decided April 30, 1992.

686

*Liggett–Pelanda Co., L.P.A.,* and *Kevin Pelanda,* for appellant.

*Arter & Hadden* and *William A. Adams,* for appellee Dayton Power & Light Co.

*Vorys, Sater, Seymour & Pease, William G. Porter II* and *Barry R. White,* for appellee Ohio Edison Company.

*Porter, Wright, Morris & Arthur, D. Michael Miller, Charles J. Kurtz* and *Mark S. Stemm; Canizzaro, Frazer & Bridges* and *Don Frazer,* for appellee Ohio Power Co.

HADLEY, Presiding Judge.

Plaintiff–appellant, Kamenar Railroad Salvage Co., Inc. ("Kamenar"), appeals from judgments filed by the Union County Court of Common Pleas which granted summary judgment to defendants-appellees, Ohio Edison Company ("Ohio Edison"), Dayton Power & Light Company ("Dayton Power &

Light"), and Ohio Power Company ("Ohio Power"), and dismissed appellant's complaint.

In October 1986, Kamenar obtained all of the right, title and interest of a right-of-way by quitclaim deed from Consolidated Rail Corporation ("Con-Rail"). That quitclaim deed contained the following relevant language:

"UNDER and SUBJECT, however, to * * * (3) any easements or agreements or agreements of record or otherwise affecting the land hereby conveyed, and to the state of facts which a personal inspection or accurate survey would disclose, and to any pipes, wires, poles, cables, culverts, drainage courses or systems and their appurtenances now existing and remaining in, on, under, over, across and through the herein conveyed premises, together with the right to maintain, repair, renew, replace, use and remove same."

The trial court found that Kamenar's president, James Kamenar, knew and had actual notice there were power lines on the property when he obtained the quitclaim deed from ConRail.

Those power lines were constructed and maintained by appellees in this case, as a result of separate agreements between each of the appellees and one of appellant's predecessors. In 1946, ConRail's predecessor, the Pennsylvania Railroad Company ("Pennsylvania"), entered into an "Agreement" with Ohio Edison, which permitted Dayton Power & Light to construct, operate, and maintain wires, cables and appurtenances across Pennsylvania's right-of-way. In 1952, Pennsylvania entered into a similar agreement with Ohio Edison. And in 1958, Pennsylvania entered into a "Master Wire Crossing Agreement" with Ohio Power, which was similar in substance to the two previous agreements that Pennsylvania had with Ohio Edison and Dayton Power & Light.

After Kamenar took possession of the right-of-way, it demanded that appellees vacate the premises. The appellees refused. After all parties moved for summary judgment, the trial court, by separate judgment entries, dismissed appellant's complaint and granted summary judgment to all appellees.[1] It is from these judgment entries that appellant asserts two assignments of error, which will be combined.

### Assignment of Error No. 1

"The trial court erred in dismissing by summary judgment plaintiff-appellant's complaint to eject defendant[s]-appellees on the grounds that plaintiff-

---

1. Although the trial judge only addressed Ohio Power's motion for summary judgment on the merits, the reasons enumerated in that July 25, 1991 decision and judgment entry also applied to the trial court's decision to grant summary judgment for Ohio Edison and Dayton Power & Light, as stated in its August 12, 1991 judgment entry.

appellant's deed to the premises conveyed an easement to appellees where there was no evidence that plaintiff-appellant's grantor intended to convey an easement, appellee's [*sic*] were not a party to, or mentioned in, the deed, and the deed contained no language conveying an interest to appellees."

### Assignment of Error No. 2

"The trial court erred in not granting plaintiff-appellant's motion for summary judgment to eject defendant[s]-appellees from his [*sic*] land where the uncontroverted evidentiary material before the court showed appellees had no legal or equitable interest in, or right to remain on, plaintiff-appellant's land."

Appellant's main contention is that the agreements between the utility companies and Pennsylvania constituted mere licenses, and were therefore revocable at the will of appellant. Appellees contend that these agreements constitute easements and, therefore, they run with the land and cannot be extinguished at the will of appellant.

It is important to note that appellant received the right-of-way by a quitclaim deed from ConRail. Quitclaim deeds are different from other deeds, such as warranty deeds.

"Further, a quit-claim deed transfers only those rights which a grantor has at the time of the conveyance. *Jonke v. Rubin* (1959), 170 Ohio St. 41 [9 O.O.2d 387, 162 N.E.2d 116], at paragraph one of the syllabus. These rights include both adverse and beneficial equities existing at the time of conveyance. *Maher v. Cleveland Union Stockyards Co.* (1936), 55 Ohio App. 412 [9 O.O. 112, 9 N.E.2d 995], at paragraph five of the syllabus. A quit-claim deed does not warrant that the grantor has a free and clear or good title. See R.C. 5302.11. In fact, a conveyance by quit-claim deed puts the grantee on notice that there may be defects in the title. *Cook v. Dinsmore* (1891), 5 Ohio C.C. 385, 393–394 [3 Ohio C.D. 189] * * *." *Finomore v. Epstein* (1984), 18 Ohio App.3d 88, 90–91, 18 OBR 403, 406, 481 N.E.2d 1193, 1196.

Since a grantee's rights are the same as those of his grantor, appellee takes subject to whatever rights ConRail had against the three utility companies. We therefore turn to the agreements between Pennsylvania and appellees to discern whether appellant takes subject to easements or licenses.

An easement can be created by grant, implication, prescription, or estoppel. 36 Ohio Jurisprudence 3d (1982), Easements and Licenses, Section 18. If a party is contending that an easement is created expressly, it is necessary that a grant be included in the language of a deed, lease, or the like. *Id.* at Section 20. Further, an express grant of an easement must meet the statutory requirements of R.C. 5301.01. *Id.* at Section 21; R.C. 5301.01. There are no particular words that are required to create an easement;

however, the words that are used in an agreement and the circumstances must be examined to determine whether an agreement creates an easement. See *Hinman v. Barnes* (1946), 146 Ohio St. 497, 32 O.O. 564, 66 N.E.2d 911.

■ Although we could find that the language of the agreements between Pennsylvania and appellees rise to the level of being easements, as they indicate that Pennsylvania wished to convey an interest in the land as opposed to a mere privilege for appellees to use the land, we cannot find that these were express easements because they failed to comply with the formal requirements of R.C. 5301.01. This statute requires that the deed or mortgage which conveys an interest in real property be witnessed and acknowledged. In all three of these agreements, there was no compliance with the acknowledgment requirement of R.C. 5301.01. Because the three agreements failed to comply with the formal requirements, they cannot be grants of express easements. See *Hout v. Hout* (1870), 20 Ohio St. 119.

■ The second way an easement can be created, by implication, requires that there be four elements present before such a conclusion can be reached. First, there must be severance of the unity of ownership of an estate. Second, before the severance of ownership, the use must have been so continued and obvious to show that it was meant to be permanent. Third, that the easement is reasonably necessary to the enjoyment of the land. Finally, that the servitude be continuous, as opposed to being temporary or for occasional use only. *Ciski v. Wentworth* (1930), 122 Ohio St. 487, 172 N.E. 276, paragraph one of the syllabus. The agreements and circumstances in the case *sub judice* fail to be implied easements by the fact, at the very least, that the first element was not met. There was no severance of title where one parcel was necessary or beneficial to another parcel. Therefore, there can be no implied easements herein.

■ The third way an easement can be created, by estoppel, requires that the party claiming such an easement must have been misled or was caused to change his position to his prejudice. *Monroe Bowling Lanes v. Woodsfield Livestock Sales* (1969), 17 Ohio App.2d 146, 149, 46 O.O.2d 208, 210–211, 244 N.E.2d 762, 764–765. Appellees have made no such claim here that they have been misled or prejudiced.

■ Finally, an easement can be created by prescription if there has been adverse possession for twenty-one years. *Id.* at 152, 46 O.O.2d at 212, 244 N.E.2d at 766. However, when a party has been given permission to use another's land, "it cannot ripen into an easement by prescription no matter how long continued." *Id.* at 152, 46 O.O.2d at 212, 244 N.E.2d at 766. Since

appellees were permissively on Pennsylvania and ConRail's land, there can be no easement created by prescription.

██ We must next address the issue of whether or not these agreements were licenses. There are two types of licenses; a mere privilege to do an act upon another's land, without possessing any interest therein and which may be revocable,[2] and licenses coupled with an interest, which make them, generally, irrevocable and, as the name implies, there is more than mere permission, there is an interest in the land. 36 Ohio Jurisprudence 3d, *supra,* at 528, Section 117; 25 American Jurisprudence 2d (1966), Easements and Licenses, Section 129.

██ Licenses coupled with an interest can be, in effect, easements which either have not complied with the formalities necessary to create an easement or easements by parol agreement. This is because there is not merely permission to do the act, but a right to do the act. If so construed to be a right it takes on those qualities. One such quality of a right is that it is not revocable. 25 American Jurisprudence 2d, *supra.*[3] These types of easements are not limited to situations where a licensee has expended a large sum of money. Licenses coupled with an interest have been found where an easement was not formed but yet the contract was not revocable at the will of either party and the parties' intention was that the contract was to be permanent and perpetual. See *Western Union Tel. Co. v. Pennsylvania Co.* (C.A.3, 1904), 129 F. 849.

██ As noted above, if it had not been for the failure of the agreements to be acknowledged pursuant to R.C. 5301.01, the language and intention of the parties reflect that these agreements were intended to be easements. All three agreements "granted" to the respective utility company the "right" to "construct" and "maintain" wires, cables, appurtenances, and/or conduits at Pennsylvania's right-of-way. The utility companies were permitted to assign and transfer their interest, subject to Pennsylvania's approval. Also, although all three agreements alluded to termination of the agreement, the language indicates that if termination were to occur it could not be done at the sole discretion of the railroad company. Ohio Edison's and Dayton Power & Light's agreements with Pennsylvania, which are virtually the same in form and substance, provide:

---

**2.** *Mosher v. Cook United, Inc.* (1980), 62 Ohio St. 2d 316, 317, 16 O.O.3d 361, 361–362, 405 N.E.2d 720, 721, and cases cited therein.

**3.** Even if in the license coupled with an interest agreement contains a right to revoke, the right to revoke is limited to those conditions in the agreement.

"Fifteenth. Upon termination of this agreement or upon the removal or abandonment of the facilities covered hereby, all the rights, title and interest of the Utility Company hereunder shall cease and determine, and this instrument shall thereupon become and be null and void * * *."

Thus, the only clause dealing with termination of the agreement indicates that it must be done mutually, as it fails to indicate that the railroad could do it at its discretion for any reason. It does provide that the utility company could do so unilaterally, by removal or abandonment of the facilities.

Ohio Power's agreement with Pennsylvania provides:

"16. This Agreement shall continue for a term of fifteen (15) years from the date hereof, and from year to year thereafter until terminated by either party giving to the other party one (1) year's advance written notice of its intention to terminate this Agreement. The termination of this Agreement shall be effective only as to crossings *thereafter* to be constructed by Power Company across, over or under, the right-of-way of Railroad Company, and shall not terminate or affect the rights, privileges and duties of the parties hereto with respect to the Power Company's facilities theretofore constructed and then existing pursuant to foregoing provisions of this Agreement.

"17. Upon the removal or abandonment by Power Company of its facilities at any crossing covered by this Agreement, all of the right, title and interest of Power Company hereunder with respect to such facilities shall cease and determine * * *. [Emphasis added.]"

Paragraph 16 permits termination by either party; however, the intention of the parties to characterize this agreement as permanent is emphasized by the fact that if the agreement were to be terminated, the termination would only cut off the right of Ohio Power to construct any additional facilities but would leave standing the already constructed facilities. Again, Paragraph 17 is similar to the agreements of Ohio Edison and Dayton Power & Light, inasmuch as removal or abandonment could be grounds for termination by the utility company.

All three agreements reflect the intention of the parties that the right granted to each respective utility company was to be permanent in nature and, in effect, give the utility companies a *right* in the railroad company's right-of-way. Because the intention of the parties reflects that the agreements were to be permanent and were to grant a right in the land, as opposed to mere privileges to use the land, we conclude that these agreements were licenses coupled with an interest and, therefore, irrevocable (except upon mutual agreement, abandonment, or removal), transferable, and assignable. Further, as a result of the qualities emanating from the fact that they are licenses coupled with an interest, this right to maintain and construct wires, cables,

and the like upon the railroad's right-of-way did not terminate when ConRail conveyed its interest in the land to appellant. Moreover, appellant took the right-of-way subject to the licenses coupled with an interest not only because that is how they are characterized, but also because of the language in the quitclaim deed itself which states:

"UNDER and SUBJECT, however, to (3) any easements or agreements of record *or otherwise affecting the land hereby conveyed.* [Emphasis added.]"

Appellant and appellees also raise the issue of notice. The quitclaim deed between ConRail and appellant provided that appellant took the right-of-way,

"UNDER and SUBJECT, however, to * * * (3) * * * the state of facts which a personal inspection or accurate survey would disclose * * *."

Thus, if anything unusual or noticeable was observed by appellant or brought to its attention as a result of an inspection or survey, it took subject to that "state of facts." It is undisputed that James Kamenar knew of the appellees' power lines at the time he acquired the right-of-way from ConRail. Therefore, as an additional basis for affirming the trial court's conclusion in granting summary judgment to appellees, we find that, in accordance with the language of the quitclaim deed, appellant acquired the land subject to appellees' power lines.

The parties also disagree whether Kamenar can establish a chain of title proving that it is the record owner of the right-of-way. We will address this issue only as it pertains to Ohio Edison.[4] Although both appellant's and Ohio Edison's title examiner provide different roots of title which may create a question of fact, it is not a genuine issue of *material* fact, as required by Civ.R. 56. Herein, it has been determined that Kamenar took the right-of-way subject to appellees' licenses coupled with an interest and cannot eject them from the right-of-way. Therefore, Ohio Edison's defense that Kamenar lacked record title does not create an issue of material fact.

For the above stated reasons, the judgment of the trial court is affirmed.

*Judgment affirmed.*

SHAW and THOMAS F. BRYANT, JJ., concur.

---

4. Dayton Power & Light did not contest this issue in the trial court. Ohio Power conceded in its Memorandum Contra Kamenar's Motions for Summary Judgment filed July 9, 1991, that Kamenar owned the right-of-way in question.