CINCINNATI ENTERTAINMENT ASSOCIATES, LTD., Appellee,

v.

HAMILTON COUNTY BOARD OF COMMISSIONERS et al., Appellants.*

[Cite as *Cincinnati Entertainment Assoc., Ltd. v. Hamilton Cty. Bd. of Commrs.* (2001), 141 Ohio App.3d 803.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000698.

Decided March 9, 2001.

---

* Reporter's Note: A discretionary appeal to the Supreme Court of Ohio was not allowed in (2001), 92 Ohio St.3d 1441, 751 N.E.2d 481.

804

806

*Taft, Stettinius & Hollister, L. Clifford Craig* and *Ross A. Wright,* for appellee.

*Michael K. Allen,* Hamilton County Prosecuting Attorney, *Carl J. Stich Jr.,* and *Christian J. Schaefer,* Assistant Prosecuting Attorneys, for appellants.

PAINTER, Presiding Judge.

For the new Great American Ballpark on the Cincinnati riverfront, Hamilton County destroyed parking and access to the Firstar Center. Firstar's owners sued to force the county to file an appropriation action, so that the value of the taken property interests could be determined. The trial court ordered the county to file a claim for an appropriation, and the county has appealed. The trial court was correct, and we affirm the order requiring the county to file an appropriation lawsuit. When the government takes private property, it must pay for it.

## I. A Long History

In 1974, two professional sports teams, the Cincinnati Reds and the Cincinnati Bengals, cooperated and co-existed in one public stadium, then named Riverfront Stadium and later renamed Cinergy Field. At the time, politicians deemed it unwise to invest tax dollars in a second theater for public entertainment. So, to accommodate alternative attractions and reinvigorate the riverfront area, Cincinnati sought and ultimately consummated a variety of interdependent contracts and grants to facilitate private investment. The result was the construction and operation of Riverfront Coliseum, later renamed the Firstar Center, which still operates exclusively on private funds, despite changes in ownership. Cincinnati Entertainment Associates ("CEA"), plaintiff-appellee, owns the Firstar Center and is the successor to the interrelated contracts and reciprocal grants with Cincinnati that enabled a public stadium and a private coliseum to co-exist.

Twenty-six years after the first contracts created a unique symbiosis of public and private interests on the Cincinnati riverfront, then Hamilton County Commissioners Robert Bedinghaus, John Dowlin, and Tom Neyer, Jr., defendants-appellants, became responsible for the city's commitments to CEA. They did so under a voter mandate to build a football-only public stadium, as well as a new and separate baseball-only public stadium, where only one dual-purpose public stadium had previously existed. Demolition and construction began despite

CEA's protests that commencement of the development would violate commitments originally made by the city.

CEA was unsuccessful in obtaining an injunction to stop the commissioners from proceeding with their vision of a three-theater riverfront, and demolition ensued. CEA claimed that, as a by-product of the demolition, certain property rights that had been created during the course of its interdependent relationship with Cinergy Field were destroyed. The trial court agreed and granted CEA's petition for mandamus. The court ordered the commissioners to begin appropriation proceedings that would determine appropriate compensation for the property rights taken by the county.

The commissioners now appeal the trial court's peremptory writ of mandamus ordering the commencement of an appropriation action for three general CEA property rights found to have been taken by the county. The interests in question are (1) CEA's use of public land for parking and staging during its events under certain agreements; (2) access to the Firstar Center through structures publicly erected and maintained under a reciprocal grant of easements; and finally (3) implied access to the Firstar Center at a specific elevation that conformed with contemporaneous requirements during the construction of the Firstar Center.

We hold that, in each of the three instances, CEA had recognizable property rights taken by the county without compensation; that the commissioners were under a clear legal duty to appropriate those rights; and that CEA had no adequate remedy at law. We therefore affirm the trial court's peremptory writ of mandamus ordering appropriation proceedings.

## II. Standard of Review

CEA urges us to review the trial court's grant of peremptory mandamus according to an abuse-of-discretion standard. We concede that there is authority for this position.[1] But, in reviewing the underlying case cited to bolster this proposition, we note that the Ohio Supreme Court has held only that "a writ of mandamus may require an inferior tribunal to exercise its judgment, [but] may not control judicial discretion, even if such discretion is grossly abused."[2]

We also note that other cases that use the abuse-of-discretion standard for appellate review of a writ of mandamus are limited to their particular circum-

---

1. See *Peterbilt of Northwest Ohio v. Caltrider* (Jan. 31, 2000), Hancock App. No. 5–99–42, unreported, 2000 WL 116088, citing *Cleveland v. Highland Hills* (June 24, 1993), Cuyahoga App. Nos. 64604 and 64605, unreported, 1993 WL 226480, citing *State ex rel. Ney v. Niehaus* (1987), 33 Ohio St.3d 118, 515 N.E.2d 914.

2. See *State ex rel. Ney v. Niehaus* (1987), 33 Ohio St.3d 118, 119, 515 N.E.2d 914, 916.

stances. So, a common pleas court's decision to issue a writ of mandamus that ordered the city of Cleveland to make a report public was properly reviewed under an abuse-of-discretion standard.[3] And, in a mandamus action before a referee, when a transcript was not filed with a party's objections, appellate review was limited to determining whether the trial court had abused its discretion in adopting the referee's report.[4] Also, mandamus relief was appropriately reviewed under an abuse-of-discretion standard "in extent of disability cases."[5]

The case before us presents a stipulated record, and the record relating to the commissioners' first two assignments of error consists of unambiguous contracts and instruments of conveyance. Their construction is a matter of law,[6] and questions of law are reviewed by an appellate court *de novo*.[7] Similarly, and even in the absence of unambiguous documents, the function of a trial court in a case tried on a stipulated record is to apply the law to the agreed facts.[8] We will review a trial court's grant of mandamus *de novo* when the underlying, stipulated record presents a question of law. Otherwise, a trial court could make a blatant error of law, and the party prejudiced would have no relief from this court.

### III. *The Writ of Mandamus*

Section 19, Article I of the Ohio Constitution states that "[p]rivate property shall ever be held inviolate, but subservient to the public welfare. [W]here private property shall be taken for public use, a compensation thereof shall first be made in money * * *, and such compensation shall be assessed by a jury." Accordingly, when a property owner claims that his property has been taken for public use without compensation, a mandamus action seeking to compel

---

3. See *Cleveland Police Patrolmen's Assn. v. Cleveland* (1996), 110 Ohio App.3d 796, 799, 675 N.E.2d 501, 503.

4. See *State ex rel. Duncan v. Chippewa Twp. Trustees* (1995), 73 Ohio St.3d 728, 730, 654 N.E.2d 1254, 1256.

5. See *State ex rel. Pass v.C.S.T. Extraction Co.* (1996), 74 Ohio St.3d 373, 376, 658 N.E.2d 1055, 1058.

6. See *Graham v. Drydock Coal Co.* (1996), 76 Ohio St.3d 311, 313, 667 N.E.2d 949, 952, citing *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph one of the syllabus.

7. See *Graham v. Drydock Coal Co.* at 313, 667 N.E.2d at 952, quoting *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm* (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684, 686.

8. See *Poe v. Sheehan* (1958), 106 Ohio App. 413, 422, 7 O.O.2d 166, 170–171, 151 N.E.2d 660, 667; *Vogler v. Sidney* (Sept. 16, 1987), Shelby App. No. 17–86–15, unreported, 1987 WL 17254, citing *Ish v. Crane* (1862), 13 Ohio St. 574, 1862 WL 56.

the appropriate public officials to initiate appropriation proceedings under R.C. Chapter 163 is proper.[9]

According to R.C. 2731.01, "[m]andamus·is a writ * * * commanding the performance of an act which the law specifically enjoins as a duty resulting from an office." To be entitled to a writ of mandamus in this case, CEA must have demonstrated the following: (1) that it possessed a clear legal right to appropriation, (2) that the commissioners were under a clear legal duty to appropriate its property rights, and (3) that it had no plain and adequate remedy at law.[10]

### IV. CEA's Clear Legal Right to Appropriation

To have asserted a clear legal right to appropriation, CEA must have demonstrated that its property was taken for public use without compensation, contrary to the requirements of Section 19, Article I of the Ohio Constitution. Property includes "any estate, title, or interest in any real property."[11] In the context of this case, a taking is the substantial or unreasonable interference with a property right.[12] The taking may include the physical taking of real property or the deprivation of an intangible interest in the property.[13]

In the trial court, CEA claimed that three separate property rights were adversely affected by the demolition and planned reconstruction of the riverfront: parking and staging rights on public property, access to the Firstar Center through publicly maintained structures, and access to the Firstar Center at a particular elevation. CEA did not claim direct ownership of any of the property that was destroyed in the renovation, but instead claimed ownership of an interest in the public property that was said to have arisen through lease, grant, and implication, respectively. We agree that in each instance CEA has a

---

**9.** See *State ex rel. BSW Dev. Group v. Dayton* (1998), 83 Ohio St.3d 338, 341–342, 699 N.E.2d 1271, 1274, citing *State ex rel. Levin v. Sheffield Lake* (1994), 70 Ohio St.3d 104, 108, 637 N.E.2d 319, 323, citing *State ex rel. McKay v. Kauer* (1951), 156 Ohio St. 347, 46 O.O. 204, 102 N.E.2d 703, paragraph three of the syllabus.

**10.** See *State ex rel. Carter v. Wilkinson* (1994), 70 Ohio St.3d 65, 637 N.E.2d 1, citing *State ex rel. Westchester Estates, Inc. v. Bacon* (1980), 61 Ohio St.2d 42, 15 O.O.3d 53, 399 N.E.2d 81, paragraph one of the syllabus.

**11.** R.C. 163.01(D).

**12.** See *State ex rel. OTR v. Columbus* (1996), 76 Ohio St.3d 203, 206, 667 N.E.2d 8, 12, citing *State ex rel. Taylor v. Whitehead* (1982), 70 Ohio St.2d 37, 39, 24 O.O.3d 88, 89, 434 N.E.2d 732, 734, and *State ex rel. McKay v. Kauer* (1951), 156 Ohio St. 347, 46 O.O. 204, 102 N.E.2d 703.

**13.** See *State ex rel. OTR v. Columbus* (1996), 76 Ohio St.3d 203, 206, 667 N.E.2d 8, 12, citing *Smith v. Erie RR. Co.* (1938), 134 Ohio St. 135, 11 O.O. 571, 16 N.E.2d 310, paragraph one of the syllabus.

recognizable property interest, and we hold that in each instance CEA's property interest is best characterized as an easement. The value of an appurtenant easement is compensable in an appropriation action.[14]

## A. The Parking and Staging Rights

In 1974, Cincinnati and the Cincinnati Coliseum Company entered into an agreement that they called a lease. The parking "lease" contemplated the arrangements whereby Coliseum patrons could park in the city's stadium parking facilities on certain event days, and it also apportioned the resulting proceeds. The agreement was assignable and was to have lasted through April 30, 2007. Separately, a "supplemental land disposition agreement" granted CEA the use of an additional parking area adjacent to the stadium for temporary storage and parking, presumably to facilitate the staging of events. This agreement was subject to the "lease" agreement.

Because the original parties to the agreement called their contract a lease and referred to the parties as landlord and tenant, CEA urges us to designate its interest in parking and staging on the county's property as a leasehold estate. A leasehold estate is an interest in property that is compensable in an appropriation action.[15] While we agree with the commissioners that the agreements did not convey a leasehold estate, we hold that the agreements conveyed a distinct and compensable interest in the property—an easement.

"[T]he only indispensable elements of a lease of an interest in real property are the rights to exclusive possession of a certain quantity of land for a term certain."[16] We doubt that the putative lease or the land-disposition agreement gave rise to the requisite exclusivity of possession. Possession of the parking areas by the "tenant" over the term of the agreement was to be sporadic at best, only for the limited time of certain Firstar events. Further, Section 501 of the agreement explicitly reserved full control of the physical facilities to the "landlord," while Section 701(4) contemplated a condition under which the "land-

14. See *State ex rel. OTR v. Columbus* (1996), 76 Ohio St.3d 203, 207, 667 N.E.2d 8, 12; *State ex rel. Lindemann v. Preston* (1960), 171 Ohio St. 303, 170 N.E.2d 489, 13 O.O.2d 406, paragraph two of the syllabus; *In re Appropriation of Easement For Hwy. Purposes* (C.P.1963), 91 Ohio Law Abs. 404, 24 O.O.2d 232, 233–235, 190 N.E.2d 65, 67–68, citing *Callen v. Columbus Edison Elec. Light Co.* (1902), 66 Ohio St. 166, 64 N.E. 141; *Rousenberg v. Krone* (Dec. 16, 1998), Monroe App. No. 775, unreported, 1998 WL 896432.

15. See *Cincinnati v. Spangenberg* (1973), 35 Ohio App.2d 168, 170, 64 O.O.2d 272, 273, 300 N.E.2d 457, 459. See, also, *Cleveland v. Zimmerman* (1969), 22 Ohio Misc. 19, 22–24, 51 O.O.2d 50, 53, 253 N.E.2d 327, 330.

16. See *Cuvier Press Club v. Fourth & Race Street Assoc., Ltd.* (1981), 1 Ohio App.3d 30, 34, 1 OBR 150, 154, 439 N.E.2d 443, 447.

lord" could take control over even the sporadic Firstar event parking. Finally, Section 205(b) provided that the "landlord" would try to avoid, but could schedule, its own simultaneous events, so that both sets of patrons would conceivably share the parking facilities. As with other courts that have considered similar issues, we are reluctant to designate such an arrangement as giving rise to a leasehold interest.[17]

 If the "lease" did not convey a leasehold interest, what did the agreement convey? While neither the commissioners nor CEA extend the analysis to this degree, it appears that the agreement conveyed either an easement or a license. An easement is an interest in the land of another that entitles the owner of the easement to a limited use or enjoyment of that land.[18] A license, by contrast, is a privilege extended by the owner of the land that permits another to enter the land for a particular purpose or use.[19] One is a right to put another's land to a certain use, the other a mere privilege to do so. This distinction is relevant because an easement is an interest in real property, but a license typically is not.[20] In this case, we distinguish between a license and an easement by examining the manner of creation and the contemplated termination of the intended use.

 Easements may arise in a number of different ways, but this particular easement would have arisen by express grant. There are no particular words required to create an easement by express grant, provided that the intent of the parties is clear from the document, and that the formal statutory requirements (a writing, signed by the parties and witnessed by two disinterested parties, whose signatures are properly acknowledged) are met.[21] The record before us contains four separate documents granting the use of the city's land for staging and patron parking at the Firstar Center: (1) the original "lease," dated January 15,

---

**17.** See *Golden West Baseball Co. v. Anaheim* (1994), 25 Cal.App.4th 11, 31 Cal.Rptr.2d 378.

**18.** See *Colburn v. Maynard* (1996), 111 Ohio App.3d 246, 253, 675 N.E.2d 1333, 1338; *Smith v. Gilbraith* (1991), 75 Ohio App.3d 428, 434, 599 N.E.2d 798, 802.

**19.** See *Mosher v. Cook* (1980), 62 Ohio St.2d 316, 317, 16 O.O.3d 361, 362, 405 N.E.2d 720, 721.

**20.** See *Ferguson v. Strader* (1994), 94 Ohio App.3d 622, 627, 641 N.E.2d 728, 731; *Columbus S. Power Co. v. Ohio Dept. of Transp.* (1989), 63 Ohio App.3d 612, 616, 579 N.E.2d 735, 738; *Weir v. Consolidated Rail Corp.* (1983), 12 Ohio App.3d 63, 65, 12 OBR 204, 206–207, 465 N.E.2d 1341, 1345, citing *Ohio Valley Advertising Corp. v. Linzell* (1958), 168 Ohio St. 259, 6 O.O.2d 420, 153 N.E.2d 773.

**21.** See *Kamenar RR. Salvage, Inc. v. Ohio Edison Co.* (1992), 79 Ohio App.3d 685, 689–690, 607 N.E.2d 1108, 1111; *Morgan v. Champaign Cty. Fish, Game & Gun Club* (Sept. 29, 2000), Champaign App. No.2000–CA–7, unreported, 2000 WL 1433932.

1974, (2) a supplemental land-disposition agreement, also signed January 15, 1974, subject to the "lease" and apparently supplemental to, (3) the contract for the sale of land dated the same day, and (4) a first amendment to the "lease," dated September 5, 1975.

The core document, the "lease," unambiguously granted a "right" to the use of the city's land that was irrevocable by the "landlord" for the term of the agreement. Further, the right was and remains assignable: that is how CEA became the successor in interest to the right. We hold that it was the clear intent of the parties to have created a right to use the city's land, rather than a mere revocable privilege.

It is less clear that the parties to the agreements observed all the necessary formalities of R.C. 5301.01, the statute of conveyances, which requires two witnesses and an appropriate acknowledgement. Each of the documents was signed by two witnesses as required, but only two of the four appear in the record to have contained the appropriate acknowledgement. When the agreements are viewed interdependently and, where appropriate, contemporaneously, the documents collectively appear to meet the acknowledgement requirements of R.C. 5301.01.

But even if the parties did not comply with all of the formal requirements of R.C. 5301.01, the easement granted would still be binding between them. The primary purpose of compliance with the acknowledgement statute is to provide proof that an interest in property has been conveyed so that it may be recorded.[22] In this case, it appears as though the conveyance was not recorded. The effect of an unrecorded conveyance or a recorded, but improperly acknowledged, conveyance is that the conveyance is "fraudulent, so far as relates to a subsequent bona fide purchaser * * * [with] no knowledge of the existence of such former * * * instrument."[23] The purpose of the statute is to protect the unwary bona fide purchaser without knowledge of an interest in the land he intends to acquire. Thus, "a defectively executed conveyance of an interest in land is valid as between the parties thereto, in the absence of fraud."[24]

The easement conveyed in the "lease" between CEA and the city was therefore binding between them, and the conveyance statute would only protect a subsequent bona fide purchaser without knowledge of the parking encumbrance. We

---

**22.** See *Basil v. Vincello* (1990), 50 Ohio St.3d 185, 188, 553 N.E.2d 602, 606.

**23.** See R.C. 5301.25(A).

**24.** See *Basil v. Vincello* (1990), 50 Ohio St.3d 185, 188 189, 553 N.E.2d 602, 606, quoting *Citizens Natl. Bank v. Denison* (1956), 165 Ohio St. 89, 95, 59 O.O. 96, 99, 133 N.E.2d 329, 332.

need not consider whether the commissioners, as assignees to the "lease," were bona fide purchasers, because the record clearly demonstrates that the commissioners knew of and expressly assumed the city's obligations under the "lease." The assignment document between the city and the commissioners, dated September 26, 1996, specifically mentioned in Section 2(k) that the commissioners agreed to assume the city's liabilities for the parking "lease."

Thus, we hold that even though the "lease" may not have complied with the statute of conveyances and was not recorded, the conveyance of the interest in land is still binding between the commissioners and CEA. By so holding, we are not required to consider whether, in the absence of the appropriate formalities, the doctrine of partial performance removed the agreements from the operation of the statute.[25] Similarly, we are not required to consider whether the agreements could have constituted a rarer form of easement, that which is created by a license coupled with an interest.[26]

We pause briefly in our analysis to distinguish a prior, unpublished decision.[27] In that case, we affirmed a determination that a lease that granted nonexclusive parking rights did not convey an interest in property. Unlike the present case, the lease granted no right to use any particular or specific area of an adjacent parking lot. Instead, the lease simply guaranteed adequate adjacent parking, and that guarantee was not disturbed when excavation began in only one corner of the adjacent lot. In the present case, there was destruction of a specific location in which CEA was granted the right of patron parking.

The commissioners further argue that because the "lease" here attempted to restrict the distribution of the proceeds from an appropriation, CEA was not entitled to assert a property interest. To the contrary, we believe that the implicit recognition that CEA would have otherwise been entitled to the proceeds of an appropriation is further evidence that the parties granted the "tenant" a property interest. But it is true that, according to the "lease," the "tenant" was not to share directly in the proceeds of an appropriation. Instead, the "landlord" was to spend up to the value of the appropriation to replace the lost parking and staging areas.

---

**25.** See, generally, *Delfino v. Paul Davies Chevrolet, Inc.* (1965), 2 Ohio St.2d 282, 31 O.O.2d 557, 209 N.E.2d 194.

**26.** See *Kamenar RR. Salvage, Inc.* (1992), *supra,* at 691, 607 N.E.2d at 1111–1112; *Cambridge Village Condominium Assn. v. Cambridge Condominium Assoc.* (2000), 139 Ohio App.3d 328, 743 N.E.2d 954.

**27.** See *Kenwood Lanes, Inc. v. Kenwood Plaza Ltd. Partnership* (Feb. 22, 1989), Hamilton App. Nos. C–870895 and C–880020, unreported, 1989 WL 13566.

To consider the distribution of appropriation proceeds is further than we are required to go to decide the case before us. Today it is sufficient for us to hold that CEA had a property interest, arising contractually, in the parking and staging areas. The record demonstrates that the commissioners took those property rights when the parking facilities and staging areas were demolished.

Finally, the commissioners argue that since the "lease" defined the parking facilities as those that "may from time to time exist," their destruction was permitted under the contract. This is a spurious argument that takes a phrase out of its obvious context. The contract also stated that any changes to the parking facilities "will not materially impair" parking for Coliseum events. Clearly the definitional language contemplated minor changes to the parking facilities, not wholesale destruction.

## B. The Reciprocal Access Easements

Some five years after the city and the Coliseum had agreed in writing on the general conditions under which a public stadium and a private coliseum would co-exist, a "reciprocal grant of easements" was signed. The primary purpose of the document was to delineate more specifically the access rights and maintenance responsibilities of the parties with respect to the interdependent walkways and support structures constructed for access to Riverfront Stadium and the Coliseum. The parties had each constructed a portion of the "Second Level Walkway" that connected their respective facilities and provided the primary means of access to the Coliseum.

Under Section 3.6 of the "reciprocal grant of easements," the city covenanted "[a]vailability of physical access, at all times, to and from the Riverfront Coliseum on, over and across the Second Level Walkway and from and to the Second Level Walkway to and from ground level." Section 4 of the grant contained the Coliseum's reciprocal responsibilities for maintenance and repair of its portion of the Second Level Walkway. Under Section 6, the easements and covenants were to have remained in effect until the Coliseum ceased to exist. Nowhere in the agreement was it contemplated that the easements would cease because of the destruction of the Stadium or any other related stadium structures.

The "reciprocal grant of easements" expressly granted the Coliseum the right to use the city's property for the limited purpose of patron access through a linked walkway. The reciprocal grant was signed by the appropriate parties, twice witnessed, and formally acknowledged, and it therefore met the requirements of the statute of conveyances.[28] Further, the easements were recorded. And while it is not required that all easements are recorded, the recording is

---

28. See R.C. 5301.01.

further indicia of the intent of the parties that the easement was to have run with the land.

As with the parking and staging rights, since an easement existed, and since that easement was taken by physical destruction, it would seem obvious that CEA is entitled to have that interest in property appropriated. But the commissioners raise two arguments in opposition, apparently unimpressed by the straightforward easements expressly granted by their predecessors.

First, the commissioners contend that their predecessor, the city, did not own the rights it purported to grant because of a prior commitment to the county itself in support of the original construction of the Stadium. Second, the commissioners contend that a "change of circumstances," specifically the demolition of the Stadium and its contiguous second-level walkway, extinguished the easement by operation of law. Both of these arguments are without merit.

■ The pre-existing commitment upon which the commissioners rely for their first argument is found in a document signed March 12, 1968, entitled a "quit claim deed." The execution of the document immediately preceded the construction of the public stadium, preceded the cooperative construction of the private coliseum by approximately five years, and preceded the "reciprocal grant of easements" by approximately ten years.

This "quit claim deed" conveyed from the city to the county the public land that would be required for construction of the public stadium. The city specifically reserved aerial rights over the land conveyed to the county, together with the support easements for the development of those aerial rights. But limiting language that was contained in the conveyance stated that "the development of such aerial rights shall not unreasonably interfere with the primary use of said property for stadium and related facility purposes." The commissioners urge us to interpret this language so as to restrict aerial rights for "any" stadium purpose that might arise. CEA, by contrast, believes that the language refers specifically to "the" stadium purpose, with reference only to the one particular stadium later built. We need not adopt either polar interpretation from the record before us.

The commissioners argue that the limiting language reserved to them a superior right to unilaterally destroy the "second level walkway" and related easements. The commissioners' argument is flawed. The record simply does not demonstrate that development of the aerial rights, specifically, in this context, construction of the second-level walkway, unreasonably interfered with the primary use of the land for stadium purposes. Instead, the record demonstrates that a public stadium thrived for approximately twenty-five years with the aerial rights so developed, and that there was no unreasonable interference. In fact, there was mutual benefit. The quoted limiting language simply did not extend to

the commissioners the right to declare a novel and unanticipated "public stadium purpose," and unilaterally to declare a pre-existing structure to be an unreasonable interference with their new purpose.

We hold that the unambiguous limiting language of the "quit claim deed" did not provide the commissioners a harbor for the taking of CEA's property interests. By so holding, we are spared from asking the parties to brief the applicability of a prescriptive easement to the present circumstances. We also need not consider whether any rights the commissioners claim in this regard may have been waived by a failure to assert them for some twenty-five years.

The commissioners' second argument is no more availing. The commissioners cite an Ohio Supreme Court case from 1860, and other more contemporary appellate decisions, for the general proposition that changes in the use and character of property may extinguish an easement.[29] An examination of the cases reveals that while the underlying proposition of law is sound, it is inapplicable to the facts of this case. Instead, a different, but similarly venerable, rule of Ohio law is controlling.

In the early Supreme Court case cited by the commissioners, two landowners agreed in 1831 to build a party wall where their lots adjoined. The party wall was to support the simultaneous construction of their respective homes. Unfortunately, the private landowners did not contemplate an expiration of the arrangement or any method for maintenance of the wall. As a result, the court struggled with an equitable termination to the short-sighted agreement, when, twenty-one years later, the party wall "had become wholly unsuited to the increased value and capabilities of the property," and one party sought to terminate the arrangement.[30] Ultimately, the court decided that any rights created by the conveyance, "*in the absence of express stipulation,* should remain no longer than their mutual benefit may require."[31]

In this case, there is no reason to struggle with an agreement lacking apportionment of maintenance responsibility or a definite termination. The sophisticated original parties to the "reciprocal grant of easements" agreed in some detail about the responsibilities for maintenance. They also agreed that the easements were to endure until the Coliseum ceased to exist. The Coliseum, now Firstar Center, still exists—so the easements remain; it is that simple.

---

**29.** See *Hieatt v. Morris* (1860), 10 Ohio St. 523, 529–530; *Siferd v. Stambor* (1966), 5 Ohio App.2d 79, 87, 34 O.O.2d 189, 194, 214 N.E.2d 106, 111; *Grau v. The Burlington Group, Inc.* (Jan. 26 1996), Geauga App. No. 94–G–1870, unreported, 1996 WL 200571; *Ford v. Estate of Tonti* (Nov. 24, 1992), Franklin App. No. 91AP–715, unreported, 1992 WL 356236.

**30.** See *Hieatt v. Morris* (1860), 10 Ohio St. 523, 530.

**31.** See *Hieatt v. Morris* at 529 (emphasis added).

■ The rule of law that is controlling in the present case was simply stated as early as 1904, and has been followed by this court. The general rule is that the owner of land burdened by an easement "may use the land for any purpose that does not interfere with the easement."[32] The stipulated record here, while voluminous and intricately interwoven, contains nothing to support a departure from the general rule.

The commissioners owned land that was burdened by easements benefiting their neighbor, CEA. The commissioners were entitled to use their land for any purpose that did not interfere with the easements. Instead, they destroyed the easements. CEA is now entitled to compensation.

## C. The Implied–Access Easement

■ Finally, CEA demonstrated that the Firstar Center was built with reliance on the availability of pedestrian and vehicular access from a surrounding plaza at a 530–foot–elevation grade. CEA argued, and the trial court found, that CEA had an implied easement for ingress and egress to its facility from this level, and that the commissioners' reconstruction had taken that right. We agree and reserve to an appropriation jury the determination of whether any damages arising from this taking have been subsumed by the taking of the expressly granted access easements discussed in the previous section.

There are essentially two Ohio Supreme Court cases upon which the parties rely to support their respective arguments.[33] Both cases recognized that an owner of property abutting a public street possessed "a private right or easement for the purpose of ingress and egress * * * [that could] * * * not be taken away or destroyed or substantially impaired without compensation therefor."[34]

In the first case, expansion of the public street in front of a business resulted in the erection of an impassable concrete curb barrier. The parking lot for the business had been previously accessible directly from the street, but, after the construction, access was available only through a less conveniently located highway exit and service road. The court held that " 'mere circuity of travel, necessarily and newly created, * * * does not of itself result in legal impairment

---

**32.** See *Gibbons v. Ebding* (1904), 70 Ohio St. 298, 71 N.E. 720, paragraph two of the syllabus; *Langhorst v. Riethmiller* (1977), 52 Ohio App.2d 137, 139, 6 O.O.3d 101, 102, 368 N.E.2d 328, 330.

**33.** See *State ex rel. OTR v. Columbus* (1996), 76 Ohio St.3d 203, 667 N.E.2d 8; *State ex rel. Noga v. Masheter* (1975), 42 Ohio St.2d 471, 71 O.O.2d 484, 330 N.E.2d 439.

**34.** See *State ex rel. Merritt v. Linzell* (1955), 163 Ohio St. 97, 56 O.O. 166, 126 N.E.2d 53, paragraph one of the syllabus.

of the right of ingress and egress.' "[35] The business owner was not entitled to compensation for the inconvenience.

In the second case, two buildings, owned by the same entity, faced each other across a dead-end public street. Neither building had developed access to the shared public street. Both buildings had separate, unconnected access to public streets abutting different boundaries of the properties. To support a planned overpass, the elevation of the shared public street was raised to accommodate gradually rising trestles, effectively denying the property owner access to either building from the shared public street. The court held that, though undeveloped, the property owner's "existing private right or easement of access * * * ha[d] been destroyed or at the very least substantially impaired."[36] The owner was entitled to compensation for a taking.

These cases are not necessarily in conflict—but even if they were, the later case, espousing a more expansive view of "taking," would control. The cases simply clarify that it is the degree of interference with the property owner's right of ingress and egress to a public street that determines whether a taking has occurred. Less convenient access through a circuitous route may not be a compensable taking. But the virtually permanent deprivation of even undeveloped access from a particular abutting public street is a compensable taking. In this case, the interference with public-street access is more than inconvenient, but, according to the stipulated plans for construction, somewhat less than permanent. We hold that the commissioners have substantially interfered with CEA's implied right of access to the abutting public streets at the existing plaza level.

The Firstar Center plaza is well above street level, and was once connected by a bridge to another 530–foot–elevation access plaza that surrounded the Stadium. It is clear from the record that the bridge and corresponding parallel plaza were the primary means for pedestrian access to the Firstar Center, and presumably the only means for vehicular access to that level. The bridge that connected the two plazas was destroyed early in the commissioners' reconstruction, even though access by way of the bridge had been expressly granted by easement, as more fully discussed in the prior section of this opinion. Similarly, the plaza that surrounded the Stadium at the 530–foot–elevation was also destroyed during reconstruction, so even if the connecting bridge had survived, it would have been useless.

---

**35.** See *State ex rel. Noga v. Masheter* (1975), 42 Ohio St.2d 471, 473, 71 O.O.2d 484, 485, 330 N.E.2d 439, 440, quoting *State ex rel. Merritt v. Linzell* (1955), 163 Ohio St. 97, 56 O.O. 166, 126 N.E.2d 53, paragraph two of the syllabus.

**36.** See *State ex rel. OTR v. Columbus* (1996), 76 Ohio St.3d 203, 209, 667 N.E.2d 8, 13.

In the trial court, CEA alleged, and the commissioners admitted, that a new plaza would eventually provide access to the new Great American Ballpark. The new plaza will be built at a lower grade than the previous plaza. The new access plaza is to be some fifteen feet lower, leaving any planned connection to the Firstar Center plaza somewhat disjointed. This problem appears to be compounded by the new location for the Great American Ballpark, which is appreciably closer to the Firstar Center than the prior stadium was. In fact, the bridge that formerly connected the two access plazas, if still standing, would be located somewhere in the Great American Ballpark's centerfield.

It is not entirely clear from the stipulated construction plans how pedestrians will negotiate the abrupt fifteen-foot elevation change from the Great American Ballpark to the Firstar Center access plaza. Nor is it entirely clear where or when vehicular access will be made available under the proposed construction plans. For now, we can only determine that some temporary accommodations for pedestrian access to the Firstar Center plaza have been made, and that it appears that vehicular access is currently unavailable.

Under these circumstances, we hold that CEA had an implied right of ingress and egress to the plaza of its facility from the public streets. CEA relied on the availability of pedestrian and vehicular access from the plaza that had been constructed at a particular grade to conform with contemporaneous requirements. There has been substantial interference with pedestrian access from the public streets, and vehicular access is at least unavailable for the duration of the lengthy construction process. This means that the commissioners have taken a property right for which CEA must be compensated. It is for a jury to determine the value of the taking, as well as the extent to which CEA will already be compensated for these implied rights by compensation for the destruction of CEA's express rights in the connecting bridge.

### V. The Commissioners' Clear Legal Duty

R.C. 307.08 codifies the commissioners' duty to appropriate property interests taken for the construction of public structures. "When * * * it is necessary to procure * * * an easement for a courthouse, jail * * * or other structure, * * * proceedings shall be had in accordance with sections 163.01 to 163.22, inclusive, of the Revised Code."[37] R.C. Chapter 163 delineates the process of property appropriation.

The commissioners do not deny that they are under a statutory duty to appropriate property interests taken for the public good. Instead, they contend that, for the various reasons examined and dispatched above, CEA has no

---

37. See R.C. 307.08.

recognizable property interests to appropriate. Having held to the contrary that CEA has compensable property interests in the three categories of easements that were taken, we hold that the commissioners are under a clear legal duty to appropriate those interests.

## VI. CEA Has No Plain and Adequate Remedy at Law

In the trial court, CEA demonstrated that it possessed a clear legal right to appropriation of three distinct easements, and that the commissioners were under a clear legal duty to appropriate those easements. But CEA would still not have been entitled to a writ of mandamus if CEA had a plain and adequate remedy in the ordinary course of the law.[38] The commissioners argue that because CEA's easement for parking and staging arose contractually, and because CEA's express access easements arose through grant, CEA had a plain and adequate remedy at law. The commissioners contend that CEA's suit was more appropriately considered a breach-of-contract action. We disagree and affirm the judgment of the trial court.

The commissioners are correct that "mandamus may not ordinarily be employed as a substitute for an action at law to recover money."[39] As an appellate court has observed, " '[m]andamus is not well adapted to the trial of questions of fact * * *. Its office is rather to command and enforce the performance of those duties * * * where the right is clear, and does not depend upon a complication of disputed facts which must be settled from the conflicting testimony of witnesses.' "[40] The court held that when a contractor and a city were in a dispute as to whether the contractor had completed a construction project, a writ of mandamus was an inappropriate form of action to compel the city to pay.

By contrast, the Ohio Supreme Court has been clear that where "a duty is based upon both contract and law, mandamus is appropriate despite the availability of another action at law."[41] So when there is no dispute that a

**38.** See R.C. 2731.05; *State ex rel. The V Cos. v. Marshall* (1998), 81 Ohio St.3d 467, 472, 692 N.E.2d 198, 203.

**39.** See *State ex rel. Mosser Constr., Inc. v. Toledo* (1996), 111 Ohio App.3d 492, 494, 676 N.E.2d 602, 604, quoting *Maloney v. Sacks* (1962), 173 Ohio St. 237, 238, 19 O.O.2d 51, 52, 181 N.E.2d 268, 269.

**40.** See *State ex rel. Mosser Constr., Inc. v. Toledo* (1996), 111 Ohio App.3d 492, 494, 676 N.E.2d 602, 604, quoting *State ex rel. Bross v. Carpenter* (1894), 51 Ohio St. 83, 89, 37 N.E. 261, 262.

**41.** See *State ex rel. Ms. Parsons Constr., Inc. v. Moyer* (1995), 72 Ohio St.3d 404, 406, 650 N.E.2d 472, 474, citing *State ex rel. Cope v. Cooper* (1930), 122 Ohio St. 321, 326–327, 171

construction project has been completed, and only a ministerial duty remains for the contractor to be paid, the contractor is entitled to a writ of mandamus to compel payment. Under these circumstances, "[a] breach of contract action would not be a plain and adequate remedy in the ordinary course of law because relator [the contractor] is not being damaged solely due to a breach of contract, but also due to a failure of public officers to perform official acts which they are under a clear legal duty to perform."[42]

In the case before us, there are no disputed facts to be settled by conflicting witnesses—there is a stipulated record presenting questions of law. Further, CEA is not being damaged solely by the commissioners' breach of contract, but also by the commissioners' failure to perform the official acts they are under a clear legal duty to perform. Consequently, CEA is entitled to a writ of mandamus compelling the commissioners to perform their official duty by commencing appropriation proceedings. In those proceedings, a jury may determine compensation—the writ is simply to order the commissioners to file the appropriation action.

### VII. Conclusion

We affirm the trial court's judgment granting a preemptory writ of mandamus and ordering the county to file an appropriation proceeding. While we have attempted to provide some guidance in this opinion, we caution that many factual issues remain to be resolved, and many legal issues addressed, in the appropriation proceeding itself.

*Judgment affirmed.*

SUNDERMANN and WINKLER, JJ., concur.

---

N.E. 399, 401. See, also, *State ex rel. The V Cos. v. Marshall* (1998), 81 Ohio St.3d 467, 472, 692 N.E.2d 198, 203.

42. See *State ex rel. Ms. Parsons Constr., Inc. v. Moyer* (1995), 72 Ohio St.3d 404, 406–407, 650 N.E.2d 472, 474, citing *State ex rel. Montrie Nursing Home, Inc. v. Aggrey* (1978), 54 Ohio St.2d 394, 397, 8 O.O.3d 401, 402–403, 377 N.E.2d 497, 499; *State ex rel. Bossa v. Giles* (1980), 64 Ohio St.2d 273, 276, 18 O.O.3d 461, 462–463, 415 N.E.2d 256, 258.