OPINION
{¶ 1} Relator-appellant OTR, an Ohio general partnership, appeals from the judgment of the Hamilton County Court of Common Pleas refusing to issue a writ of mandamus to compel respondents-appellees, the city of Cincinnati, various city officials, and the Hamilton County Commissioners, to commence an appropriation action to compensate OTR for the taking of its property rights as a result of the demolition of an elevated walkway directly connecting the Atrium Two office building in Cincinnati to the riverfront parking areas at or around a public stadium. OTR raises four assignments of error for our review. For the reasons that follow, we reverse.
I. FACTS
 {¶ 2} OTR is the statutory nominee for the State Teachers' Retirement Board of Ohio ("the Board"). The Board finances the retirement program for Ohio's public-school teachers through investments, including real estate such as the Atrium Two office building. Atrium Two is located at the southwest corner of Fourth and Sycamore Streets in downtown Cincinnati. It contains approximately 650,000 square feet of net rentable office and retail space, common areas, and a 154-space parking garage.
 {¶ 3} Atrium Two was designed and built by the Atrium Two Development Company ("ATDC"). OTR provided post-construction financing for Atrium Two. In 1987, OTR acquired a seventy-percent co-tenancy interest in Atrium Two. In April 1997, OTR purchased the remaining thirty-percent interest from ATDC.
 {¶ 4} In the early 1970s, the city of Cincinnati developed a plan for the redevelopment and growth of the central riverfront and the central business district. The centerpiece was Riverfront Stadium (later renamed Cinergy Field), which was built to accommodate both the Cincinnati Reds and the Cincinnati Bengals. The stadium had a public plaza at an elevation of 530 feet, which was above the limits of periodic floods, above Fort Washington Way, and close to the elevation of Fourth Street. The city's Central Riverfront Project, Amended Urban Renewal Plan of May 1971, set forth the plan to have a stadium on the central riverfront that would provide parking for its events and would "supplement parking for the entire Downtown Business District." The plan also provided for "pedestrian bridges across Fort Washington Way connecting directly to the [stadium] Plaza" at the 530-foot elevation.
 {¶ 5} Around 1970, the city built the first vehicular and pedestrian bridge from Hammond Street. This bridge, which included both a bus/taxi ramp and a pedestrian walkway, spanned Third Street and Fort Washington Way and terminated on the north side of the large public plaza of the stadium. Steps were constructed descending from the north end of the stadium plaza to the north side of Pete Rose Way (formerly known as Second Street). A second "pedestrian only" bridge was built from the north side of the stadium plaza. It spanned Fort Washington Way and Third Street and terminated on the public sidewalk on the north side of Third Street between Walnut and Main Streets.
 {¶ 6} In August 1979, the city sold Central Riverfront Business District Core Urban Renewal Project Parcel N-1 to a private developer, Atrium One, Limited. The bus/taxi ramp and pedestrian bridge was thereafter extended from Hammond Street to the south side of the Atrium One building. The extension included a pedestrian bridge over Hammond Street and Third Street and a platform tower on the south side of Third Street. It was inclined from the elevation of Fourth Street to the 530-foot elevation of the stadium plaza. For clarity of discussion, the parties have referred to the original pedestrian bridge and the extension as the elevated walkway. We adhere to that designation.
 {¶ 7} In March 1982, the city amended its Urban Renewal Plan to specify how the block N properties, which later would become the Atrium Two building, were to be developed for office use, directly connected to the elevated walkway from the stadium plaza, and made a part of the city's skywalk system. In September 1982, the city sold Central Riverfront Business District Core Urban Renewal Project Parcel N-2 to ATDC. The "Contract for Sale of Land for Private Redevelopment for Parcel N-2" provided that the developer of Atrium Two would design its building to accommodate a future connection between the property and north of Fourth Street via a skywalk, and that the developer would grant the city an easement through its building that would connect the city's skywalk system to the "general pedestrian public easement which now exists or as it may hereafter be located from the Riverfront Stadium to the South Side of Fourth Street. Said easement shall be for pedestrian traffic (including wheelchair or similar ambulatory devices) and shall be open 24 hours per day." The contract further provided that the developer of Atrium Two was obligated to grant the city "* * *a public easement for the Winter Garden [a ground-floor lobby area between the Atrium One and Atrium Two buildings] which easement shall permit the public to enter and traverse through it during normal business hours."
 {¶ 8} The contract additionally provided that "no change shall be made in the Urban Renewal Plan that physically affects the use of the Property, except with the consent of the Redeveloper* * *." Throughout the contract, there were references to the 1982 amended Urban Development Plan. The contract stated that the covenants for use by ATDC would end January 1, 2000. The 1982 amended Urban Development Plan expired on January 1, 1987.
 {¶ 9} In November 1983, the city and ATDC entered into a "Supplemental Agreement No. 1 to Contracts for Sale of Land for Private Development by and between the City of Cincinnati and Atrium Two Development Company." In section four of that agreement, ATDC, in order to assure adequate parking for Atrium Two, agreed to construct upon the city's request an additional parking garage with a minimum of 300 spaces in the core of the central business district or central riverfront urban-renewal areas. ATDC also agreed to deliver a letter of credit to the city as security for its performance of this obligation. The city, however, never required ATDC to build this garage.
 {¶ 10} In December 1983, ATDC acquired an additional piece of property from the city. The deed provided that ATDC was to "grant a permanent skywalk easement by metes and bounds description for use by the pedestrial public on a twenty-four hours a day, seven days a week basis connecting Fourth Street skywalk to the Stadium Bus-Taxi Ramp south of Third Street upon completion of redevelopment of real property" and that this was to "be a covenant running with the land* * *."
 {¶ 11} During the construction of Atrium Two in 1983-1984, the elevated walkway was modified and relocated from the south side of the Atrium One building to the south side of Atrium Two. It was attached above Hammond Street to an outdoor plaza on the Atrium Two property that served both Atrium One and Atrium Two. Thereafter, the elevated walkway provided direct, covered pedestrian access from the south side of the Atrium Two plaza to riverfront parking.
 {¶ 12} In July 1993, the city filed a lawsuit against OTR, ATDC, its then co-tenant, and Connecticut General Life Insurance Company, their mortgagee, to enforce the provision of its sales contract with ATDC that required ATDC or its successor to "grant the city an easement through the office building so as to connect the skywalk to the public easement from the riverfront stadium to Fourth Street." The lawsuit was settled in October 1995, when the parties entered into a "Fourth Street Walkway Agreement." Shortly thereafter, ATDC modified Atrium Two to accept the Fourth Street skywalk by building an escalator from the second level to the lobby and by modifying the public-access easements to provide continuous access from the Fourth Street skywalk through Atrium Two.
 {¶ 13} In 1996, voters approved a sales-tax increase to fund construction of new stadiums for the Cincinnati Reds and the Cincinnati Bengals. Sometime thereafter, the city amended its urban renewal plan to reflect a new development plan, which included the creation of the two new public stadiums, as well as parks, museums, and other amenities in the central riverfront area. This revised plan did not include the pedestrian bridge south of Atrium Two because of changes in grading. Under the revised plan, pedestrians could directly obtain access to the riverfront from street level through the addition of streets and sidewalks, and the creation of formal intersections with traffic lights.
 {¶ 14} To effectuate the new riverfront development, the city and Hamilton County entered into a recorded agreement in September 1996 whereby the city assigned to the county in subsection four "all of the City's ownership rights and obligations, including, but not limited to, performance and maintenance obligations, liabilities, debts and claims for the following parts of the pedestrian and vehicular skywalks directly serving the Riverfront complex: * * *
 {¶ 15} "(c) The bus/taxi and pedestrian bridge over Fort WashingtonWay and Third Street, the tower and the access steps on the North Side ofthe stadium : The bridge extends from the north side of the Stadium to the south side of Hammond Alley approximately 620 feet in length;
 {¶ 16} "(d) The pedestrian bridge over Hammond Alley and ThirdStreet and the tower on the south side of Third Street The bridge extends from the south side of Third Street to the north side of Hammond Alley approximately 340 feet in length;
 {¶ 17} "(e) All other skywalks or elevated vehicular or pedestrian bridges which attach to or connect other portions of the City skywalk or street system directly to the Stadium complex."
 {¶ 18} The assignment further provided that "the above described parts of the skywalk system [were] subject to the rights of the public for use as public rights-of-way, and [could] not be demolished, closed, reconstructed or modified without the prior written approval of the City Manager."
 {¶ 19} In March 1999, OTR and the city entered into an "Entry Agreement" whereby OTR agreed to allow the city to remove certain concrete supports for the elevated walkway and to relocate them in conjunction with the reconstruction of Fort Washington Way. The agreement provided that "[t]he city's work when complete, shall relocate and reattach the pedestrian bridge to another section of the plaza, in accordance with plans supplied by Owner, and the pedestrian access from the Fourth Street Skywalk to the Stadium and surrounding areas shall thereafter be maintained for regular pedestrian traffic."
 {¶ 20} On September 25, 2000, a week before the county was scheduled to close the bus/taxi ramp and elevated walkway over Fort Washington Way, OTR filed a complaint for injunctive relief and a writ of mandamus. The trial court denied OTR's motion for a temporary restraining order on September 28, 2000. The county closed the elevated walkway on October 2, 2000, when construction for the new baseball stadium, the Great American Ballpark, necessitated the removal of a portion of the old stadium plaza to which the elevated walkway had been connected. The parties, however, entered into a stipulation prohibiting the further demolition of the bridge until OTR's motion for a preliminary injunction was heard. Sometime thereafter, the city built temporary wooden steps, north of Third Street and south of the rear of Atrium Two's plaza, to provide pedestrians access from the remaining portion of the skywalk to the bus-taxi ramp extending from Hammond Street.
 {¶ 21} On December 18, 2000, the trial court held a hearing on OTR's motion for a preliminary injunction. The parties had agreed to an extensive stipulation of facts. In addition to these stipulated facts, the parties presented testimony from several witnesses. Numerous exhibits were also admitted into evidence. After two days of testimony from David Warner, the private developer of the Atrium One and Atrium Two buildings, Arnold I. Rosenberger, the project manager for the Great American Ballpark, and Steven Richter, the building manager for Atrium Two, the trial court denied OTR's motion for a preliminary injunction on January 26, 2001.
 {¶ 22} Although only a portion of the bus/taxi ramp and the elevated walkway had been demolished it remained closed. Therefore, OTR proceeded on its claim for a writ of mandamus. The parties presented two more days of testimony to the trial court. Steven Richter, the building manager for Atrium Two, testified on cross-examination about the operation of Atrium Two before and after the county's closure of the elevated walkway. Robert L. Richardson, the city's architect, testified regarding the new riverfront plans. Thomas Rehme, a former assistant city solicitor, and Nell Day Surber, the former development director for the city, each testified regarding the negotiations concerning the development of Atrium Two.
 {¶ 23} On September 4, 2001, the trial court refused to issue a writ of mandamus. On appeal, OTR now raises four assignments of error.
III. ANALYSIS
 {¶ 24} In the first assignment of error, OTR argues that trial court erred in refusing to issue a writ of mandamus to compel the city and/or the county to compensate it for the loss of its property rights in the elevated walkway. In the second, third, and fourth assignments of error, OTR argues that the trial court erred by failing to recognize that OTR had property rights, both as a result of its status as an abutting property owner and as a result of the contractual agreements between its predecessor, ATDC, and the city, which, OTR contends, gave it an express and/or implied right of access over the elevated walkway to riverfront parking. For simplicity of discussion, we address these assignments together.
 {¶ 25} Both the United States and Ohio Constitutions guarantee that if the government takes private property for public use, it must provide the owner of that property with just compensation.[1] Where a property owner claims that his property has been taken by the government and that he has been damaged, and appropriation proceedings have not been instituted, the property owner may proceed to seek a writ of mandamus to compel the initiation of such appropriation proceedings.[2] A property owner, though, is only entitled to a writ of mandamus if he can demonstrate the following: (1) a clear legal right to the relief requested; (2) a clear legal duty to perform the act requested; and (3) the absence of a plain and adequate remedy in the ordinary course of the law.[3]
{¶ 26} In this case, OTR would have had a right to the requested relief and the city and/or county would have been under a clear legal duty to commence appropriation proceedings only if OTR could demonstrate that the closure and demolition of the elevated walkway amounted to a taking of OTR's property. In order to establish a taking, OTR had to demonstrate "a substantial or unreasonable interference with a property right."[4] Such interference may involve the actual physical taking of real property, or it may include the deprivation of an intangible interest in the premises.[5]
{¶ 27} OTR first argues that the trial court erred as a matter of law when it held that the closure and demolition of the elevated walkway did not amount to a taking of its implied right of access to an abutting right-of-way.
{¶ 28} Under Ohio law, "an owner of a parcel of real property has a right to access public streets or highways on which [its] land abuts[,] and * * * any governmental action that substantially or unreasonably interferes with this right constitutes a taking of private property * * *."[6] However, governmental action that merely renders a property owner's right of access to an abutting street less convenient or more circuitous does not by itself constitute a taking.[7]
{¶ 29} The trial court held that the elevated walkway was not a right-of-way under Cincinnati Municipal Code 721-1-S, which defines an elevated walkway as a sidewalk. The court reasoned that the walkway could only have become a public right-of-way if it had been properly dedicated under Section 8, Article VII of the Charter of the City of Cincinnati. Because the city had never formally dedicated the elevated walkway as a right-of-way, the trial court concluded that the walkway was not a right-of-way.
{¶ 30} OTR contends that the trial court erred as a matter of law when it held that the elevated walkway was not a public right-of-way without a dedication. OTR argues that it was not required to prove the elevated walkway had been dedicated to public use, because the city had built the elevated walkway within the rights-of-way of several public streets, and it was, therefore, automatically a public right-of-way. The city and county argue, however, that, absent a dedication, the elevated walkway was merely a structure within the rights-of-way of several streets. We agree with the city and county.
{¶ 31} In Ohio, property may be dedicated to public use for streets and roads pursuant to either statutory requirements[8] or the rules of the common law.[9] While dedication procedures are typically employed by private property owners, municipal corporations may also utilize them to make a valid dedication of a way through municipal land.[10] Thus, when a property owner claims that a municipal corporation has dedicated its own property to public use as a street or road, the owner must demonstrate either that the municipal corporation has statutorily dedicated the property to such public use or that the property has become dedicated to public use through the common law.[11] Proof of a municipal corporation's intent to dedicate its land to public use for streets and roads is necessary because dedication not only deprives the municipal corporation of its proprietary interests in the property, but also subjects it to statutory burdens regarding the upkeep of streets and roads.[12] Thus, in order to establish that the elevated walkway in this case was a public right-of-way, OTR had to prove that the walkway had been dedicated to public use.
{¶ 32} OTR next contends that even if proof of a dedication was required, it presented competent, credible evidence that the elevated walkway had been dedicated to public use under common-law principles. OTR argues that the trial court erred as a matter of law when it failed to consider any evidence of a common-law dedication.
{¶ 33} The city and county contend, however, that because Section 8, Article VII of the city's charter only provides for statutory dedication of streets, alleys, or rights-of-way, and OTR presented no evidence of a statutory dedication, the trial court correctly concluded that the elevated walkway had not been dedicated to public use.[13] We disagree.
{¶ 34} The mere fact that OTR failed to present evidence of a statutory dedication of the walkway did not preclude proof of a common-law dedication.[14] Ohio courts have recognized that a statutory provision for the dedication of property for a particular public purpose does not generally preclude a common-law dedication.[15] Thus, notwithstanding that specific statutory proceedings are provided for the dedication of land for streets and roads, there may be a valid common-law dedication for such purposes.[16] Consequently, we reject the city and county's argument that Section 8, Article VII of the city's charter provides the exclusive means by which public rights-of-way may be created by the city.
{¶ 35} In order to show that the elevated walkway was dedicated under the common law, OTR had to prove the following: (1) the existence of an intention on the part of the city to make such a dedication; (2) an actual offer on the part of the city, evidenced by some unequivocal act, to make such dedication; and (3) the acceptance of such offer by or on behalf of the public.[17] A city's intent to dedicate can be either express or implied from its actions.[18] Public acceptance can also be express or implied. To imply acceptance by the public of a street or road dedication, public use alone is insufficient.[19] Thus, OTR had to demonstrate that the city had taken control or direction over the elevated walkway.[20]
{¶ 36} Our review of the record reveals that the city had committed in its urban renewal plan to build a pedestrian bridge that would connect directly to the stadium plaza. In 1970, the city built the bridge, which included both the bus/taxi ramp and the pedestrian walkway, and then contracted with Atrium Two to connect the pedestrian portion of the bridge to its building. The city additionally provided a cover for that portion of the elevated walkway directly linking Atrium Two to the riverfront parking and maintained all but fifty feet of the entire walkway. Thus, the city's construction of the elevated walkway was consistent with a use for street purposes.[21]
{¶ 37} Furthermore, neither the city nor the county dispute that the walkway was open twenty-four hours per day for use by the general public, and that tenants of Atrium Two, as well as the public at large, had extensively used the walkway until its closure on October 2, 2000. As evidence of this public use, OTR presented a July 1999 headcount and survey of walkway users, which found some 5,500 persons per day crossing the walkway and entering or leaving Atrium Two.
{¶ 38} Moreover, the assignment of rights between the city and county provided that "the above described parts of the skywalk system are subject to the rights of the public for use as public rights-of-way, and shall not be demolished, closed, reconstructed or modified without the prior written approval of the City Manager." (Emphasis added) Such reservations were consistent with the city's treatment of the walkway and bus/taxi ramp as a street.[22] Under these circumstances, the manifest weight of the evidence demonstrated that the city intended to dedicate the elevated walkway for street purposes. Additionally, the public's continuous use of the elevated walkway for three decades, combined with the city's maintenance of the walkway, was sufficient to imply an acceptance of a public dedication. Consequently, we conclude that the elevated walkway became dedicated to public use as a street through common-law principles.[23]
{¶ 39} Having determined that the elevated walkway was a street, we must next address whether the elevated walkway abutted Atrium Two. The city contends that OTR could not have been an abutting owner because the elevated walkway did not border Atrium Two, but only touched it at a point. We disagree.
{¶ 40} In Eastland Woods v. Tallmadge,[24] the Ohio Supreme Court addressed the meaning of the phrase "abutting landowner." It held that "property must share a common border with a street to actually abut it."[25] Thus, property that touches a public street at one point, but does not share a common border with the street, does not abut the public street.[26] In a subsequent case, the court stated that this definition was "in accord with that set forth under the word "abut" in Black's Law Dictionary (5 Ed.1979), which provides [that] the term 'abutting' implies a closer proximity than the term 'adjacent.' No intervening land."[27]
{¶ 41} Given that the parties stipulated that the elevated walkway was attached directly to the south plaza of Atrium Two, we fail to see how the city can assert that there was not a common border between the plaza and the elevated walkway.[28] Consequently, we find the city's argument to be without merit.
{¶ 42} OTR next contends that the trial court's decision that the walkway's removal did not substantially or unreasonably interfere with Atrium Two's rights of ingress and egress was clearly erroneous. We agree.
{¶ 43} The trial court held that the county's demolition of the walkway did not substantially affect Atrium Two's access to riverfront parking because Atrium Two still had access to other abutting streets, including Hammond Street, that abutted the south side of the building and because pedestrians would still be able to leave the south plaza and obtain access to riverfront parking once permanent steps had been constructed from the plaza to street level. The trial court concluded that the change in grade of the street system had not destroyed Atrium Two's access to riverfront parking; it had only changed it. In doing so, the trial court distinguished this court's decision in Cincinnati Entertainment Assoc. Ltd. v. Board of Commissioners of Hamilton Co. ("CEA").[29]
{¶ 44} In CEA, we held that the county's demolition of the stadium plaza at the 530-foot elevation, along with a bridge that connected the stadium to the Firstar Center, had amounted to a taking of CEA's implied right of access to abutting public streets at the existing plaza level.[30] In that case, we relied upon the fact that the Firstar Center's plaza had been built above street level in reliance on the availability of pedestrian and vehicular access from a surrounding plaza at a 530-foot elevation.[31] We also relied upon the fact that the bridge and corresponding parallel plaza were the primary means for pedestrian as well as vehicular access to the Firstar Center.[32] In CEA, the county had admitted that a new plaza would eventually be built to connect the Firstar Center to the new stadium, but that it would be built at a lower grade that would leave the connection between the Firstar Center and the new stadium disjointed.[33] Given these circumstances, we held that the lack of vehicular access, combined with the temporary pedestrian access, amounted to a taking of CEA's implied right of ingress and egress to the plaza of its facility from the public streets.[34]
{¶ 45} OTR contends that the trial court erred in characterizing the loss of its access as insubstantial and distinguishing its case from our decision in CEA. OTR maintains that, like CEA, the city required that the south entrance of Atrium Two be built at the 530-foot elevation so that it could connect directly with the elevated walkway. OTR argues that the loss of the walkway substantially interfered with its use of Atrium Two because it deprived the office building of all pedestrian access from its southern side at the 530-foot elevation.
{¶ 46} The city and county, on the other hand, contend that because Atrium Two still has access to riverfront parking and because pedestrian access under the new street system is much improved at grade level, OTR failed to demonstrate that the removal of the walkway substantially interfered with its right of ingress and egress. We disagree.
{¶ 47} The parties stipulated that the walkway, which was an abutting right-of-way, would be completely demolished, and that the county and city had no plans to provide access from the plaza. Under these circumstances, the trial court's conclusion that OTR's access rights had merely changed was clearly erroneous and contrary to the evidence. The eventual demolition of the walkway will completely extinguish OTR's access rights at the 530-foot elevation.
{¶ 48} The trial court's conclusion that OTR would still have access from its southern plaza once steps were built to connect the plaza to street level does not allay the city and county's interference with OTR's right of access. Under Ohio law, an abutting property owner is entitled to damages for any change in the grade of a street abutting his property that substantially interferes with the owner's rights of ingress and egress.[35] The Ohio Supreme Court has stated that a substantial interference occurs when a change in the grade of a street abutting the private owner's property renders the buildings thereon less convenient to access, and the property owner, in order to make its access as convenient as it formerly was, must incur additional expenses to alter its buildings.[36]
{¶ 49} Moreover, the trial court's conclusion that OTR's access had not been substantially changed because it had access to other public rights of ways is not supported by the law. OTR's access to other abutting streets does not "diminish or negate" the fact that the city" and/or county interfered with OTR's right of access to the elevated walkway at the 530-foot level.[37] The Ohio Supreme Court has stated that "the denial of access to one abutting street can still constitute a taking of private property regardless of the fact that there remained alternate means of access to the property in question."[38]
{¶ 50} Given that Atrium Two was built in reliance upon access at the 530-foot elevation, access at the 530-foot level no longer exists, and that the city and/or county have made no plans to restore this access, the evidence unambiguously demonstrates that the city and/or county's demolition of the walkway substantially interfered with OTR's right to access at the 530-foot elevation. Consequently, the trial court erred when it refused to issue a writ of mandamus to compel appropriation proceedings for the taking of OTR's right of access to the elevated walkway.
{¶ 51} OTR next argues that the trial court erred in refusing to issue a writ of mandamus to compensate OTR for the loss of its property rights arising from the city's agreements with ATDC and OTR. OTR alleges that these property rights stemmed from the amended urban renewal plan and three agreements, each of which contemplated that Atrium Two's parking needs would be largely satisfied by the public parking to which it would be directly linked by the walkway. OTR contends that these agreements established a contractual duty that was breached when the elevated walkway was demolished. OTR relies primarily on our decision in CEA to support this argument.
{¶ 52} In CEA, we held that three separate agreements between the city of Cincinnati and the Firstar Center's developer concerning parking created a property interest best characterized as an easement, and that the property interest was taken by the county's demolition at the 530-foot elevation.[39] The first agreement, which the parties had termed a "parking lease," permitted the center's patrons to park in the city's stadium parking facilities on certain event days and apportioned any resulting parking proceeds among the Firstar Center and the city.[40]
This "parking lease" was assignable and was to have lasted through April 30, 2007. A second agreement between the city and the Firstar Center's developer, which was subject to the lease agreement, granted CEA the use of an additional parking area adjacent to the stadium for temporary storage and parking, presumably to facilitate the staging of events.[41]
The city and the developer had also signed a third agreement a reciprocal grant of easements that delineated access rights and maintenance responsibilities of the parties with respect to the interdependent walkways and support structures constructed for access to Riverfront Stadium and the Firstar Center.[42] This reciprocal grant of easements, the covenants of which were to remain in effect until the Firstar Center ceased to exist, expressly granted the center the right to use the city's property for the limited purpose of patron access through a linked walkway.[43]
{¶ 53} Unlike the property owner in CEA, OTR presented no documents in the trial court providing it with any specific right to parking. The 1982 Amended Urban Renewal Plan, the provisions of which expired in January 1987, merely specified how the Block N properties, which later would become the Atrium Two building, were to be developed for office use, directly connected to the elevated walkway from the stadium plaza, and made a part of the city's skywalk system. Moreover, we cannot say that the language contained in the Contract for Sale of Land for Private Redevelopment for Parcel N-2 relating to the public use of the elevated walkway provided OTR with any express right to parking or obligated the city to maintain the walkway in perpetuity. OTR additionally relies on language in the 1995 agreement with the city relating to the Fourth Street Skywalk, as well as the 1999 entry agreement with the city. The 1995 walkway agreement is irrelevant because it concerns only the skywalk over Fourth Street. Additionally, the 1999 entry agreement merely provided that the city would relocate and reattach the pedestrian bridge upon completion of the necessary work on the Fort Washington Way project. The city completed this work and reattached the bridge. Because none of these documents provided OTR with any express property rights, we cannot say the trial court erred in holding that OTR did not have any express contractual right of access to riverfront parking.
III. CONCLUSION
{¶ 54} Having concluded that OTR's right of access at the 530-foot elevation has been destroyed, we hold that OTR is entitled to a writ of mandamus to compel the initiation of appropriation proceedings. But, based upon the record before us, we cannot determine whether the city alone, the county alone, or both of them have the legal duty to initiate these proceedings. We, therefore, reverse the trial court's decision and remand this case for a hearing, at which the trial court must determine the party or parties to whom the writ should issue,[44] and for the issuance of an appropriate writ.
Judgment reversed and cause remanded.
PAINTER, P.J., and DOAN J. concur.
[1] See Fifth and Fourteenth Amendments to the United States Constitution; Section 19, Article I, Ohio Constitution.
[2] See State ex rel. BSW Dev. Group v. Dayton, 83 Ohio St.3d 338,341, 1998-Ohio-287, 699 N.E.2d 1271.
[3] State ex rel. Westchester Estates, Inc. v. Bacon (1980),61 Ohio St.2d 42, 399 N.E.2d 81, paragraph one of the syllabus.
[4] State ex rel. OTR v. Columbus, 76 Ohio St.3d 203, 207,1996-Ohio-411, 667 N.E.2d 8.
[5] Id.
[6] See OTR v. Columbus, 76 Ohio St.3d 203, syllabus; State ex rel. Pitz v. Columbus (1988), 56 Ohio App.3d 37, 41, 564 N.E.2d 1081.
[7] See State ex rel. Noga v. Masheter (1975), 42 Ohio St.2d 471,330 N.E.2d 439.
[8] See, e.g., R.C. 711.06 and 723.03.
[9] See Vermillion v. Dickason (1976), 53 Ohio App.2d 138,372 N.E.2d 608.
[10] See Hicksville v. Lantz (1950), 153 Ohio St. 421,92 N.E.2d 270.
[11] Id., paragraph three of the syllabus.
[12] Id. at 426-427.
[13] {a} Section 8, Article VII, of the City's Charter, provides the following: "All plans of the subdivision of lands within the corporate limits of the city or within three miles thereof, and all instruments of dedication of lands for public use, shall be submitted to the commission and approved thereon in writing by it before they may be offered for record or accepted by the city. The approval of the commission shall not be deemed the city's acceptance of the dedication of any street, alley, way or other public ground shown on the plat or set forth in the instrument.
{b} "No street, alley, way, or other public ground shall be accepted by the city as a public street, way or ground, unless the plat and location thereof shall have been submitted to and approved by the commission; provided however, that council may submit to the commission any ordinance proposing to accept the dedication of any such unapproved street, alley, way, or ground, and if approved by the commission, council shall have the power to accept the dedication thereof by a majority vote, or, if disapproved, by a vote of not less than two-thirds of its members."
[14] See Hicksville, 153 Ohio St. at 426-427; Pennsylvania R. Co. v. Girard (C.A.6, 1954), 210 F.2d 437, 442; Zetzer v. Lundgard (1953),95 Ohio App. 51, 52, 117 N.E.2d 445; State ex rel. Litterst v. Smith, (1950), 87 Ohio App. 513, 517-518, 94 N.E.2d 802.
[15] Steubenville v. King (1873), 23 Ohio St. 610.
[16] Silverthorne v. Parsons, (1899), 60 Ohio St. 331; see, also, Eggert v. Puleo (1993), 67 Ohio St.3d 78, 84-85, 616 N.E.2d 195, wherein the Ohio Supreme Court recognized that dedication of property for public use as a street can be accomplished by means other than a municipal ordinance. In that case, the court recognized that the creation of a street through the platting process was a separate type of dedication from that provided in R.C. 723.03.
[17] See Dickason, 53 Ohio App.2d at 141.
[18] See State ex rel. Mentor Lagoons, Inc. v. Wyant (1957),166 Ohio St. 169, 140 N.E.2d 788; Hicksville,153 Ohio St. at 426-427.
[19] See State ex rel. Fitzhum v. Turinsky (1961), 172 Ohio St. 148,153, 174 N.E.2d 240.
[20] Fitzhum, supra, at paragraph one of the syllabus
[21] See State ex rel. Cincinnati Garage Co. v. Bird, (1970),25 Ohio Misc. 69, 72-73, 263 N.E.2d 330.
[22] Cf. Hicksville, 153 Ohio St. at 427-428 (where the Ohio Supreme Court held that public use of a village driveway to and from a privately owned parking lot, which the village had leased for five years at a nominal rental, did not evidence any intent on the village's part to dedicate the driveway as a street, particularly when the lease was terminable at any time on 30 days' notice).
[23] We are not saying that other portions of the city's skywalk system are automatically public rights-of-way. See, e.g., Nusekabel v. Cincinnati Public School Employees Credit Union (1997),125 Ohio App.3d 427, 431, 708 N.E.2d 1015, wherein we recognized that whether a street has been dedicated to public use is a factual determination.
[24] (1983), 2 Ohio St.3d 185, 187, 443 N.E.2d 972.
[25] Id.
[26] Id.
[27] In the Matter of the Vacation (of a Public Road) (1985),18 Ohio St.3d 397, 399, 482 N.E.2d 570.
[28] See Messinger v. Cincinnati (1930), 36 Ohio App. 337, 342,173 N.E. 260.
[29] (2001), 141 Ohio App.3d 803, 753 N.E.2d 884.
[30] Id. at 819.
[31] Id. at 820.
[32] Id. at 821.
[33] Id.
[34] Id.
[35] See OTR, supra, at 207-209, citing State ex rel. McKay v. Kauer (1951), 156 Ohio St. 347, 102 N.E.2d 703; Lotze v. Cincinnati (1899),61 Ohio St. 272, 55 N.E. 828.
[36] See, also, In re Appropriation of Easement for Highway Purposes (1952), 93 Ohio App. 179, 112 N.E.2d 411.
[37] See OTR, supra, at 209.
[38] Id.
[39] 141 Ohio App.3d at 809.
[40] Id at 812.
[41] Id.
[42] Id. at 816-817.
[43] Id.
[44] Our uncertainty results from the fact that the county and city entered into an assignment in 1996 regarding the walkway, which the trial court never addressed, and which the parties have not otherwise elaborated upon. We are certain, however, that either the city or the county, or both of them, had a duty to appropriate in this case.