**KENT'S RUN PARTNERSHIP, LTD., Appellant,**

v.

**Mark L. GLOSSER, Trustee for Midwest Portland Cement Co., Maysville Regional Water District, Office of the U.S. Trustee, Appellees.**

Civ.A. No. 03–1760.
Bankruptcy No. 97–23098–JLC.

United States District Court,
W.D. Pennsylvania.

March 31, 2005.

George M. Cheever, Kirkpatrick & Lockhart LLP, Pittsburgh, PA, Thomas A. Young, Porter, Wright, Morris, & Arthur, Columbus, OH, for appellant.

Steven T. Shreve, Pittsburgh, PA, Linda A. Michler, Bethel Park, PA, for appellees.

Stephen I. Goldring, Office of the U.S. Trustee, Pittsburgh, PA.

## OPINION

CERCONE, District Judge.

The central issue in this appeal is whether the bankruptcy court erred by denying the trustee's and co-movant's motion to assume and assign an executory contract under 11 U.S.C. § 365(a). The bankruptcy court determined that 11 U.S.C. § 365(a) did not permit the contract's assumption and assignment because (1) at the time the bankruptcy petition was filed, the contract was no longer executory and (2) even if the contract were executory, the assignment of the debtor's personal easement to the co-movant/appellant would constitute an impermissible expansion of the limited property interest granted in the contract and related deed. After careful consideration of the arguments presented and the au-

thority bearing on the matters raised, the court concludes that the motion to assume and assign the contract properly was denied. Accordingly, the bankruptcy court's order of October 10, 2003, will be affirmed.

## Procedural History

On May 5, 1997, an involuntary bankruptcy petition was filed against Midwest Portland Cement Company ("Midwest"). During the course of proceedings, the trustee, Kents Run Partnership Ltd. ("Kents Run"), ES Cement Corporation, and ESSROC Cement Corporation entered into a settlement agreement. *See* Bkcy. Ct. Doc. No. 157.

Paragraph 23 of the settlement agreement obligated the trustee to institute and prosecute with reasonable diligence a proceeding pursuant to 11 U.S.C. § 365(a) and Bankruptcy Rule 6006(a) authorizing the trustee to assume and assign an executory contract. The trustee sought to assume and assign a 1993 contract between Midwest and Maysville Regional Water District ("Maysville") regarding the purchase and sale of real property and the creation of certain easements. The settlement agreement was not contingent upon the success of the trustee's motion. The bankruptcy court approved the settlement agreement, and the trustee, together with Kents Run, filed a "Motion to Assume and Assign Executory Contract" ("the motion").[1]

After a hearing, the bankruptcy court denied the motion in a Memorandum Opinion and Order dated October 10, 2003 ("Memorandum Opinion"). The trustee and Kents Run now appeal that ruling.

## Factual history

The historical facts underlying the motion are uncontested. All of the properties involved are located in Muskingum County, Ohio.

Maysville is a municipal regional water district formed pursuant to Chapter 6119 of the Ohio Revised Code in order to supply water in a defined unincorporated area of Muskingum County. One source of Maysville's water is an impoundment of water known as Frazier Quarry. Maysville has held title to Frazier Quarry since 1971.

Midwest owned the land surrounding Frazier Quarry (the "Frazier Quarry Surrounding Property") and land located several miles south of Frazier Quarry which consisted of Lake Isabella and the property surrounding the lake (the "Lake Isabella Property"). Midwest also owned property adjacent to the Frazier Quarry Surrounding Property and Lake Isabella Property ("Midwest Adjacent Property"). Additionally, Midwest held the right to mine limestone under property owned by Kents Run immediately north of the Frazier Quarry Surrounding Property (the "Kents Run Property").[2]

Lake Isabella was a potential source of water for Maysville. In a letter to Midwest dated January 27, 1993, Maysville inquired about purchasing the Frazier Quarry Surrounding Property and the Lake Isabella Property. In the negotiations that followed, both parties expressed the desire that certain easements be included in any sales agreement. Midwest insisted that it receive a fifty-foot wide easement across the Frazier Quarry Surrounding Property and a narrow portion of the Frazier Quarry in order to construct

---

1. The parties recognized that the bankruptcy court's approval of the settlement agreement would not resolve the merits of the trustee's motion.

2. Midwest's mining right has since expired and/or been terminated.

and maintain both a belt conveyor system to transport stone mined from the Kents Run Property and a terminal/storage facility on the Frazier Quarry Surrounding Property for the stone (the "Midwest Belt/Storage Facility Easement"). Maysville sought several waterline and access easements from Midwest that would burden the Midwest Adjacent Property, which was not being sold to Maysville in the real estate transaction (the "Maysville Waterlines/Access Easements").[3]

Negotiations culminated in a contract dated March 15, 1993 ("the contract"). In the contract Midwest agreed to sell, and Maysville agreed to purchase, the Frazier Quarry Surrounding Property and the Lake Isabella Property. The contract also provided for the creation of "appropriate easements as agreed in the purchase descriptions attached." The described easements were the Midwest Belt/Storage Facility Easement and the Maysville Waterlines/Access Easements.

Midwest signed a deed conveying to Maysville the Frazier Quarry Surrounding Property and the Lake Isabella Property ("the deed") on December 22, 1993. The deed, which was subsequently recorded, included specific provisions describing the easements reserved by and/or granted to Midwest and Maysville.[4] The deed was not signed by Maysville, even though it had agreed to burden the Frazier Quarry with the Midwest Belt/Storage Facility Easement.

The deed described the Midwest Belt/Storage Facility Easement as follows:

> Reserving to [Midwest] *a non-assignable easement to be held only by [Midwest]* for the purpose of the construction

and maintenance of a beltline and terminal area for a 50 foot (wide) easement across the Frazier Quarry property (providing for a stone "belt" conveyor) from the north to the south (bridging the quarry at a narrow point in the southern part of the quarry) and termination into a Storage Facility in the area of Well # 17. Stone may be transferred from this point by truck through a cut (to be made) in the spoil bank and on to Old Town Road. This easement to be more particularly described after construction of said terminal and beltline.

1993 Deed, reproduced as Exhibit E to the Motion to Assume and Assign Executory Contract (Bkcy.Ct.Doc. No. 194) (emphasis added).

The Maysville Waterlines/Access Easements were described in five separate sections of the deed. Each section began with "[a]lso granting to [Maysville] an easement for the purpose of. . ." and ended with:

> This easement which is located on adjoining property of [Midwest] shall be binding upon and inure to the benefit of the parties hereto, their heirs, administrators, successors, and assigns, and shall be part of and run with the above described property. Any conveyance of [Midwest]'s adjoining property shall be made subject to this easement.

*Id.* The deed also stated the Maysville Waterlines/Access Easements were "to be more particularly described after construction of a waterline." *Id.*

After the filing and recording of the deed, the parties did not execute any other deeds, nor did they file or record any

---

3. In its opinion, the bankruptcy court referred to the Midwest Belt/Storage Facility Easement as "Easement # 1" and the Maysville Waterlines/Access Easements as "Easement # 2."

4. Specifically, the deed was recorded in the chains of title for the Frazier Quarry Surrounding Property and the Lake Isabella Property.

**414**

additional documents related to any of the easements. None of the easements have ever been "more particularly described" as permitted by the deed. As of the petition date, neither Midwest nor anyone else constructed the stone belt conveyor system or the storage facility permitted by the Midwest Belt/Storage Facility Easement.

**The Bankruptcy Court Opinion**

In the Memorandum Opinion, the bankruptcy court addressed the matters raised by the motion. The co-movants took the position that material unperformed obligations remained on the part of both Midwest and Maysville under the contract. Specifically, they argued that both Midwest and Maysville had failed to take the appropriate steps to create and perfect the easements promised in the contract. From their perspective, this failure rendered the contract executory and therefore assignable.

After discussing the development of the case and the parties' arguments, the bankruptcy court observed that the trustee and Kents Run admitted that the deed legally created the easements as between Midwest and Maysville without any further recording. After further analysis, the bankruptcy court concluded that the contract ceased to be executory upon the presentation and acceptance of the deed.

The bankruptcy court further opined that the Midwest Belt/Storage Facility Easement could not be assigned to Kents Run even if the contract were executory. It reasoned that the language of the deed created a non-assignable easement in gross, personal to Midwest, and the assignment of Midwest's personal easement to Kents Run would transform the personal easement into an easement appurtenant, causing it to run with the land. Such an assignment would assertedly constitute an impermissible expansion of the limited property interest granted in the contract

and the related deed. For these reasons, the bankruptcy court denied the motion.

**Arguments on Appeal**

Appellants contend the bankruptcy court erred in concluding that the contract was no longer executory. They argue the execution and recording of the deed performed only a portion of Midwest's and Maysville's obligations under the contract and there remained unperformed obligations that the bankruptcy court failed to recognize as material. In addition, appellants contend the Midwest Belt/Storage Facility Easement was an assignable interest in land because the bankruptcy code expressly permits a bankruptcy trustee to assign an executory contract "notwithstanding a provision in [such] executory contract ... that prohibits, restricts, or conditions the assignment of such contract." 11 U.S.C. § 365(f)(1).

Maysville essentially contends that any remaining obligations were ministerial at best and therefore the contract was not executory, and in any event, permitting an assignment of the contact would change the property interest given to Midwest in a manner that would violate the basic principle that the bankruptcy code was not intended to enhance or enlarge implicitly the debtor's rights under state law.

**Standard of Review**

■ This court reviews the bankruptcy court's factual findings to determine whether they are "clearly erroneous" and exercises plenary review over its legal conclusions. *TTS, Inc. v. Citibank, N.A,* 158 B.R. 583, 584 (D.Del.1993); *see also In re Taylor,* 103 B.R. 511, 513 (D.N.J.1989), *aff'd in part,* 913 F.2d 102 (3d Cir.1990). In this context, "plenary review" means *de novo* review. *In re Rashid,* 210 F.3d 201, 205 (3d cir.2000). The instant case was decided below essentially on undisputed facts, and the issues raised on appeal are

questions of law. Accordingly, the standard of review is *de novo.*

## Analysis

### Issue One: Was the contract executory?

■ Section 365 of the bankruptcy code provides: "[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). This section enables the trustee to maximize the value of the debtor's estate by assuming executory contracts that benefit the estate and rejecting those that do not. *In re Rickel Home Centers, Inc.,* 209 F.3d 291, 298 (3d Cir.2000).

The bankruptcy code does not define the term "executory contract," nor does § 365(a) indicate the phrase's intended scope. *In re Columbia Gas System, Inc.,* 50 F.3d 233, 238 (3d Cir.1995). The legislative history of § 365 indicates that "[t]hough there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides." *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.,* 872 F.2d 36, 39 n. 4 (3d Cir.1989) (citing H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 474 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 58 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5844, 6303). Most courts have found this definition to be too broad and sweeping. *See, e.g., Sharon Steel Corp.,* 872 F.2d at 39. As stated by the United States Court of Appeals for the Seventh Circuit, "[t]aken literally, this definition would render almost all agreements executory since it is the rare agreement that does not involve unperformed obligations on either side." *In re Streets & Beard Farm Partnership,* 882 F.2d 233, 235 (7th Cir.1989).

■ Recognizing a relaxed definition of "executory" would render nearly every contract executory, the United States Court of Appeals for the Third Circuit adopted the "Countryman" definition of an executory contract. *Sharon Steel Corp.,* 872 F.2d at 39; *In re Columbia Gas,* 50 F.3d at 238. Acknowledging that "[a]ll contracts to a greater or less extent are executory [and when] they cease to be so, they cease to be contracts," Professor Countryman defined an executory contract as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Countryman, *Executory Contracts and Bankruptcy: Part 1,* 57 Minn.L.Rev. 439, 450 and 460 (1973); *see also Sharon Steel Corp.,* 872 F.2d at 39. A contract must meet the Countryman definition on the date the bankruptcy petition was filed. *In re Columbia Gas,* 50 F.3d at 240. Thus, a contract is executory under § 365 only if each party has an unperformed obligation at the time of the bankruptcy filing that would constitute a material breach if not performed. *Id.* at 239–40.

■ The materiality of any remaining unperformed obligation is evaluated according to the relevant non-bankruptcy law. *Id.* at 240 n. 10. Thus, a federal court must look to the state law applicable to the contract to determine whether a breach is material. *Id.* In the instant case, Midwest and Maysville expressly agreed that Ohio law would govern the contract. Accordingly, Ohio contract law governs whether the parties' failure to perform any remaining obligations amounts to a "material breach."

■ The Ohio Court of Appeals has adopted the Restatement (Second) of Contracts approach in evaluating the material-

ity of a failure to perform. *Kersh v. Montgomery Developmental Center*, 35 Ohio App.3d 61, 519 N.E.2d 665, 668 (1987); *Rhodes v. Rhodes Industries, Inc.*, 71 Ohio App.3d 797, 595 N.E.2d 441, 447–48 (1991). The Restatement identifies five factors to be considered; specifically, it states:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account all of the circumstances[,] including any reasonable assurances; [and]
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing.

*Rhodes*, 595 N.E.2d at 447–48 (*quoting* Restatement (Second) of Contracts (1981) § 241).

■■ Following a short-handed version of this analysis as commonly used before the Restatement (Second) approach was adopted, Ohio courts also have explained that a material breach will not be recognized where a party has substantially performed its obligations under the contract. *Hansel v. Creative Concrete & Masonry Construction Co.*, 148 Ohio App.3d 53, 772 N.E.2d 138, 141 (2002); *see also Kersh*, 519 N.E.2d at 668. "Substantial perform-

ance of a contract is interpreted to mean that mere nominal, trifling, or technical departures are not sufficient to break a contract, and that slight departures, omissions and inadvertences should be disregarded." *Kichler's, Inc. v. Persinger*, 24 Ohio App.2d 124, 265 N.E.2d 319, 321 (1970). *See also Hansel*, 772 N.E.2d at 141 ("Mere nominal, trifling, or technical departures are not sufficient to constitute a breach").

■ In the instant case, appellants assert that the following material obligations remained unperformed under the contract and related deed:

- Midwest and Maysville were obligated to limit their use of any easement to the particular purpose for which it was granted;

- Midwest and Maysville were obligated to "more particularly" describe the easements following the construction of various improvements;

- Midwest had to make any conveyance of the Adjacent Midwest Property subject to the Maysville Waterlines/Access Easements;

- Maysville had to execute and record an appropriate written document creating that part of the Midwest Belt/Storage Facility Easement that crossed Frazier Quarry; and

- Midwest had to file a document in the chain of title of the Adjacent Midwest Property to provide notice of the Maysville Waterlines/Access Easements to subsequent purchasers.

■ Appellants' contention—that each party's obligation to use their respective easement for its stated purpose somehow metamorphosizes a discrete property interest into an executory contract—is misplaced. Were this to be true, any agree-

ment in which two parties grant each other easements would remain forever executory because, as a general matter, the obligation to use the easement for its stated purpose continues for the life of the easement. Appellants have cited no persuasive authority for this proposition, and the proposition does not appear to be tenable. In an agreement where two parties contract to grant each other easements, the contract ceases to be executory when the parties receive what they bargained for—the discrete interests in property. From that point forward, any use of the property interest contrary to the right which was granted is a property dispute, not a breach of the original contract.

 Appellants' argument that the contract is executory because the parties were required to describe the easements more particularly clearly misses the mark. Appellants confuse an unperformed obligation, which may amount a material breach, with an obligation conditioned upon the occurrence of another event, which is excused upon the nonoccurrence of the condition. *See In re Columbia Gas,* 50 F.3d at 241. Contract law distinguishes between the failure of a condition and the breach of a duty: "Non-occurrence of a condition is not a breach of duty by a party unless he is under a duty that the condition occur." *In re Columbia Gas,* 50 F.3d at 241 (*quoting* Restatement (Second) of Contracts § 225(3)); *see also* Restatement (Second) of Contracts § 255 cmt. d (unless the obligee is under a duty to perform the event upon which the duty is conditioned, the non-occurrence of the event fails to give rise to a claim). As explained by the Restatement, "a contracting party's failure to fulfill a condition excuses the performance by the other party whose performance is so conditioned[; in other words] it is not, without an independent promise to perform the condition, a breach of contract subjecting the nonfulfilling party to liability for damages." *In re Columbia Gas,* 50 F.3d at 241 (citing *Merritt Hill Vineyards, Inc. v. Windy Heights Vineyard, Inc.,* 61 N.Y.2d 106, 472 N.Y.S.2d 592, 460 N.E.2d 1077, 1081–82 (N.Y.1984) (citing Restatement (Second) of Contracts § 225(3))).

The deed provided that the Midwest Belt/Storage Facility Easement was "to be more particularly described *after* construction of said terminal and beltline," and that one of the Maysville Waterlines/Access Easements was "to be more particularly described *after* construction of a waterline."[5] 1993 Deed (emphasis added). The language chosen by the parties thus clearly indicates the duty to "more particularly describe" the easements was not to arise until *after* either the construction of the beltline/storage facility or the waterline. Furthermore, neither the contract nor the deed contains promises to create these improvements. Thus, the construction of the beltline and/or waterline is a condition that must occur before the duty to "more particularly describe" either easement arises, and neither party made an independent promise to perform the respective condition; therefore, the nonoccurrence of the condition excuses the party whose performance was conditioned on the event's occurrence. *See In re Columbia Gas,* 50 F.3d at 241.

**5.** The deed itself does not indicate the party that is to more particularly describe each easement: it states simply that the easements are to be "more particularly described." Appellants assert that Maysville logically had the duty to describe more particularly the Midwest Belt/Storage Facility Easement, and Midwest logically had the duty to more particularly describe the Maysville Waterlines/Access Easements. *See* Appellant's Brief (Doc. No. 4) at 15. Because the conditions giving rise to these duties never occurred, it is not necessary for the court to reach the matter.

Appellants and Maysville acknowledge that no beltline or storage facility was ever constructed on the Midwest Belt/Storage Facility Easement. The bankruptcy court observed that neither party ever requested the other to more particularly describe either easement and "no evidence was presented to establish that either party attempted to construct [their respective improvement]." Memorandum Opinion at 10–11. Since each duty to describe the easement more particularly is conditioned on the construction of an improvement that was never built, no duty to do so ever arose. Because no performance was due on the date of filing, appellants' reliance on these provisions clearly is misplaced.

Similarly, appellants confuse unperformed obligations with conditional duties in asserting that the contract is made executory by Midwest's obligation to burden any future conveyance with the Maysville Waterlines/Access Easements. The deed contains the following sentence after each grant forming the Maysville Waterlines/Access Easements: "Any conveyance of [Midwest's] adjoining property shall be made subject to this easement." At the earliest, the duty to convey the adjoining property subject to the easement arises when a conveyance of the Midwest Adjoining Property is made. A breach of this duty could not occur until Midwest conveyed to a purchaser without notice of the easements. As of the petition date, Midwest had not conveyed any portion of the Adjacent Midwest Property. Appellants' Brief (Doc. No. 4) at 17–18. Because the event that would trigger the duty had not yet occurred, appellants' argument that the contract remained executory because of Midwest's obligation to make future conveyances subject to the easements must fail.[6]

Appellants' final argument—that the contract is executory because both Maysville and Midwest were obligated to create and/or record certain documents to convey and/or perfect the easements contemplated therein, and that neither party did so—is also unavailing. Specifically, appellants cite as an unperformed material obligation Maysville's failure to sign the deed or execute and record an appropriate document conveying and providing notice of the portion of the Midwest Beltline/Storage Facility Easement crossing the Frazier Quarry.[7] Similarly, appellants contend that a material obligation is evidenced by Midwest's failure to record an appropriate document in the chain of title of the Adjacent Midwest Property that would provide notice to subsequent purchasers of the easements burdening that land.

It is undisputed that no such document was ever created or recorded by either party after the execution of the deed. The question then becomes whether the failure of Maysville and Midwest to create and record these documents reflecting the conveyances and providing notice to subse-

---

**6.** Although the filing date is the time for determining whether a contract is executory, the trustee's subsequent actions have been in conformance with the duty to make any conveyance subject to the easement. In footnote twelve of their brief, appellants note:

The Trustee has always recognized an obligation to make any conveyance of the Adjacent Midwest Property subject to the Maysville Waterlines/Access Easements. Each of the two contracts which the Trustee entered into to sell the Adjacent Midwest Property

and other estate property to third parties made the sale of the Adjacent Midwest Property subject to the Maysville Waterlines/Access Easements.

Appellants' Brief (Doc. No. 4) at 14 fn. 12.

**7.** They admitted, however, that the deed signed by Midwest was effective to create the easement as between Midwest and Maysville without any further recording. Memorandum Opinion at 10.

quent purchasers rendered the contract "so far underperformed that the failure of either [party] to complete performance would constitute a material breach excusing performance of the other." *Sharon Steel Corp.*, 872 F.2d at 39 (*quoting* Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 Minn.L.Rev. at 460). An analysis under Ohio law inescapably leads to the conclusion that these outstanding duties were not material and therefore are not sufficient to render the contract executory.

The approach in determining whether a breach is material under the five factors set forth in the Restatement is "necessarily imprecise and flexible." Restatement (Second) of Contracts § 241 and cmt. a. Appellants only focus on the first factor, the extent to which the injured party will be deprived of the benefit which he reasonably expected. *See id.* § 241(a). They argue that Maysville's failure to create and record a written document reflecting the portion of the easement crossing Frazier Quarry deprived Midwest of the Midwest Belt/Storage Facility Easement, an important benefit under the contract, and suggest that Midwest has been *wholly* deprived of an essential component of the bargain. Appellants' position is inaccurate and belied by their admission that the actions taken prior to the petition date *were* sufficient to create the easements as between Midwest and Maysville. *See* Memorandum Opinion at 17.

Moreover, notwithstanding any admission on the part of appellants, Ohio law clearly establishes that the deed was effective to create legally enforceable easements as between Midwest and Maysville. In *Cincinnati Entertainment Associates, Ltd. v. Hamilton County Board of Commissioners*, 141 Ohio App.3d 803, 753 N.E.2d 884, 891–92 (2001), the Ohio Court of Appeals considered whether a series of four documents was sufficient to create an easement under Ohio Revised Code 5301.01.[8] The court opined that the four agreements appeared, collectively, to meet the formal acknowledgment requirements of Ohio Revised Code § 5301.01. It went on to explain, however, that regardless of whether the formal statutory requirements were met, the conveyance was valid and enforceable as between the two parties. It opined:

> [E]ven if the parties did not comply with all of the formal requirements of R.C. 5301.01, the easement would still be binding between them. The primary purpose of the acknowledgment statute is to provide proof that an interest in property has been conveyed so that it may be recorded.... The purpose of the statute is to protect the unwary bona fide purchaser without knowledge of an interest in land he intends to acquire. Thus, a defectively executed conveyance of an interest in land is valid as between the parties thereto, in the absence of fraud.

*Cincinnati Entertainment Associates*, 753 N.E.2d at 892.

Here, although the deed was not signed by Maysville and was therefore not executed in strict compliance with Ohio Revised Code § 5301.01, it was nonetheless sufficient to create the portion of the Midwest

---

**8.** Prior to February 2, 2002, the Ohio Revised Code § 5301.01 required that a written instrument conveying an interest in real property be signed in the presence of two witnesses by the grantor; that two witnesses attest to the signing; that such signing be acknowledged by the owner before a person authorized to administer an oath; and that the authorized person then certify such acknowledgment in writing on the instrument. Effective February 2, 2002, Ohio Revised Code § 5301.01 no longer requires any witnesses to such a written instrument.

Belt/Storage Facility Easement crossing Frazier Quarry as between Midwest and Maysville. *See id.* Since Ohio law recognizes the easement as between Midwest and Maysville, and since Maysville continues to own the Frazier Quarry, the easement has been in continuous existence since the execution of the deed. It follows that appellants' suggestion that Midwest has been wholly deprived of the Midwest Belt/Storage Facility easement is legally unfounded.

While the easement exists and is enforceable as between Midwest and Maysville, it is not enforceable as between Midwest and a subsequent bona fide purchaser without knowledge of the easement because a document reflecting the easement has never been recorded in the chain of title for Frazier Quarry. *See Spring Lakes, Ltd. v. OFM Co.,* 12 Ohio St.3d 333, 467 N.E.2d 537, 540 (1984) ("[I]n order for a purchaser of real property to be charged with constructive notice of an encumbrance contained in a prior instrument, the prior instrument must be recorded in the purchaser's chain of title."); *cf. Ohio Department of Natural Resources v. Hughes,* 145 Ohio App.3d 202, 762 N.E.2d 422, 428 n. 6 (2001) ("[A]s between parties to a real estate transaction, failure to record a deed does not void the transaction; recording of the deed serves only to protect a grantee in the event that the grantor ever attempts to convey an interest in the property to a third party.") Thus, Midwest has been deprived of a benefit it expected under the contract to the extent that the Midwest Belt/Storage Facility Easement is unenforceable against a subsequent bona fide purchaser without notice.

The same is true with respect to the Maysville Waterlines/Access Easements. The deed was sufficient to create the Maysville Waterlines/Access Easements, but Midwest did not record it, or any other document, in the chain of title for the Adjacent Midwest Property. Thus, on the filing date, Maysville had likewise been deprived of the benefit of easements that are enforceable against subsequent bona fide purchasers.

If the mere deprivation of a benefit was all that was required, appellants' position would carry the day. But the analysis of materiality under Ohio law does not end with a finding that a party has been deprived of a benefit expected under the contract; rather, it considers additional factors, such as the likelihood that the party who has failed to perform will cure its failure and the extent to which that party's behavior "comports with the standards of good faith and fair dealing." Restatement (Second) of Contracts § 241(d) and (e). The likelihood that a failure can be cured is significant to the determination of whether a breach is material, particularly where there is a sound reason to believe that performance will be forthcoming. The Restatement explains: "The fact that the injured party already has some security for the party's performance argues against a determination that the failure is material. So do reasonable assurances of performance given by the other party after his failure." *Id.* § 241, cmt. e.

Midwest never requested that Maysville sign the deed or take any action to provide notice of the Midwest Beltline/Storage Facility Easement in the chain of title prior to the bankruptcy date. Once Maysville became apprised of the irregularity in the deed caused by the absence of its signature, Maysville indicated its willingness to correct the situation. In its brief, Maysville states it "stands ready[,] willing and able to undertake" the filing of an appropriate document that would record the portion of the Midwest Belt/Storage Facility Easement that crosses Frazier Quarry. Appellee's Brief (Doc. No. 5) at 10. Filing

an appropriate document in the chain of title would amount to no more than a nominal undertaking. Because Midwest received reasonable reassurances immediately after the irregularity came to light that the requested document would be filed, and since the task is indeed ministerial, there is little reason to believe that Maysville would fail to perform.[9] *See, e.g., In re Streets & Beard Farm Partnership,* 882 F.2d at 235 (the mere delivery of legal title "does not represent the kind of significant legal obligation that would render the contract executory"); *see also In re Walker,* 227 B.R. 870, 871–72 (Bankr.S.D.Ind. 1998) (same). Thus, this factor weighs heavily in favor of finding that the breach was not material. *See Software Clearing House, Inc. v. Intrak,* 66 Ohio App.3d 163, 583 N.E.2d 1056 (1990) (efforts made by the party who failed to perform to "remedy what it perceived to be its own shortcomings and to perform the contract in good faith" supported trial court's finding that the party's breach was not material).

Furthermore, appellants have failed to identify any conduct by Midwest or Maysville that reflects a lack of good faith and fair dealing. To the contrary, prior to the bankruptcy petition date neither Midwest nor Maysville believed that the contract had been materially breached. The petition was filed in May of 1997, nearly four years after the parties entered into the contract in March of 1993 and nearly three and a half years after the execution of the deed. During this lengthy period of time, neither party contested the deed, requested the execution and recording of these additional documents, or demanded reasonable assurances of further performance. It follows that on the petition date, neither party believed the other had breached the contract or its implicit covenant of good faith and fair dealing.

Thorough consideration of the Restatement's factors pertaining to a failure to perform leads to the conclusion that neither Midwest nor Maysville has materially breached the contract. The easements have been in continuous existence since 1993; the only benefit lost is the easements' enforceability against subsequent purchasers without notice; Maysville stands willing and ready to execute the appropriate documents to preserve the Midwest Beltline/Storage Facility Easement against any subsequent purchaser; the act of creating and filing documents in the chain of title is a ministerial task; and neither party engaged in conduct that failed to "comport with standards of good faith and fair dealing." Accordingly, any unperformed obligation did not amount to a material breach under Ohio law.

Because neither party had outstanding duties on the date of filing which, if not performed, would amount to a material breach, the contract is not executory. *See In re Columbia Gas,* 50 F.3d at 239. Because the contract was not executory, the bankruptcy court's order of October 10, 2003, must be affirmed.

### Issue Two: The nature of the easement conveyed

■ Moreover, even assuming the contract were to be executory, the assignment of Midwest's easement to Kents Run under § 365 would constitute an impermissible expansion of the property interest granted in the deed. Appellants claim merely to be seeking the elimination of language in the deed assertedly making the easement non-assignable. But the removal of the language referenced by appellants would not change the interest they

---

9. Indeed, Maysville indicates that the only reason it has not done so is to assure it maintains proper respect for the court. Appellee's Brief (Doc. No. 5) at 10.

received under state law. And the conversion of the easement into an assignable one would impermissibly expand the debtor's rights in contravention of established principles governing the interpretation of the bankruptcy code. Thus, the assignment of the easement cannot be sanctioned under § 365 in any event.

■ Federal bankruptcy law is designed to work in conjunction with state property law; thus, absent specific federal preemption, state law determines the nature and extent of the debtor's property rights. *See, e.g., Integrated Solutions, Inc. v. Service Support Specialties, Inc.*, 124 F.3d 487, 491–93 (3d Cir.1997) (discussing the role of preemption in bankruptcy law and the Supreme Court and Third Circuit's conservative approach in employing the doctrine). In order to assess whether the relief requested by appellants is appropriate, it is necessary to determine (1) the extent of Midwest's property rights in the Midwest Belt/Storage Facility Easement under Ohio law and (2) whether federal law specifically mandates a different result.

■ An easement is an "interest in the land owned by another person, consisting in the right to use or control the land, or an area above or below it, for a specific limited purpose." Black's Law Dictionary 527 (7th ed.1999). In general, Ohio law recognizes two distinct classes of easements: easements appurtenant and easements in gross. *See, e.g., Nolan v. Bender*, 61 N.E.2d 628, 631–32 (Ohio Ct.App. 1944). *See also* Ohio.Jur.3d *Easements and Licenses in Real Property* § 59 (2004) ("*Easements and Licenses*").

■ An easement appurtenant is an easement that runs with the land. *Nolan*, 61 N.E.2d at 632. Such an easement arises when the grantee holds, at the time of the easement's conveyance, an estate in land that is benefitted by the easement obtained. *Id. See also DeShon v. Parker*, 49 Ohio App.2d 366, 361 N.E.2d 457, 458 (1974). The benefitted estate is the dominant estate or dominant tenement, and the burdened estate is known as the servient estate or servient tenement. *Easements and Licenses* § 11. Once created, easements appurtenant cannot be separated or transferred independently from the dominant estate. *Id.*

■ Conversely, an easement in gross has no dominant estate; it is entirely servient. *DeShon*, 361 N.E.2d at 458. It exists purely independent of any other estate in land and generally is a personal right which by definition cannot be assigned or transferred. *See id.* at 458–59. *See also Nolan*, 61 N.E.2d at 632.

■ In ascertaining whether an easement is appurtenant or in gross, Ohio courts consider the language used in the conveyance, the surrounding circumstances, the intended use of the easement, and the occasion giving rise to its existence. *Nolan*, 61 N.E.2d at 632. The construction of an easement as appurtenant is favored whenever possible. *DeShon*, 361 N.E.2d at 459 (An easement "is never presumed to attach to the person of the grantee when it can fairly be construed as appurtenant to some other estate").

■ Here, the deed's plain language clearly granted Midwest only a personal easement in gross. The deed states: "Reserving to [Midwest] a non-assignable easement to be held only by [Midwest] for the purpose of the construction and maintenance of a beltline and terminal area...." 1993 Deed. It is difficult to contemplate how the expressed manifestation of the parties' intent could have been clearer. And, as noted by the bankruptcy court, the parties knew how to draft an easement appurtenant and did so in creat-

ing the various Maysville Waterlines/Access Easements. Memorandum Opinion at 12–13 (noting that each easement granted to Maysville in the deed included language indicating: "This easement...shall be binding upon and inure to the benefit of the parties hereto, their heirs, administrators, successors and assigns and shall be part of and run with the above described property").

Appellants argue that § 365 authorizes removal of the restriction on assignability allegedly caused by the phrase "non-assignable easement to be held only by [Midwest]." They assert that with the removal of this language, the Midwest Belt/Storage Facility Easement can be assumed by the trustee and assigned to Kents Run.

Appellants' attempt to identify the language in the deed as the sole obstacle to obtaining an assignable easement is misplaced. Ohio law mandates a much broader inquiry, and consideration of all appropriate factors leads inevitably to the conclusion that even without the language the easement would remain personal and non-assignable.

■ Ohio courts examine the circumstances outside a deed to determine the type of easement granted. The Court of Appeals of Ohio has explained:

> It is proper to look outside the instrument creating the easement in order to determine whether it is appurtenant or in gross. The court may look outside the deed to determine whether the owner of the easement owns land to which it may be appurtenant. If the court finds that there is no land to which the easement may be appurtenant, it will hold that the easement is not appurtenant, but in gross, even though the instrument granting the easement states that the easement is created for the owner thereof, his heirs and assigns.

*Nolan,* 61 N.E.2d at 632. Thus, the language of the deed is not necessarily controlling, particularly where the circumstances indicate that the actual interest transferred was different than suggested by the words of conveyance. *See id.*

Here, when Midwest received the easement it did not own any estate in land that could be considered the dominant tenement. Therefore, even without the words "non-assignable" and "to be held only by [Midwest]," the Midwest Belt/Storage Facility Easement would remain a personal easement in gross under Ohio law.

■ Because it is well-settled that an easement appurtenant cannot be converted into an easement in gross or visa-versa under Ohio law, *Nolan,* 61 N.E.2d at 632, the relief appellants seek is only available if federal law mandates a different result. The question then becomes whether § 365 can be used to change the property interest conveyed in the deed, as appellants contend.

■ The Supreme Court, in defining the proper roles of federal and state law in the bankruptcy context, has eschewed the use of an expansive approach to federal preemption. *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). After noting that Congress generally left to state law the determination of the debtor's property rights, the Court in *Butner* emphasized the need for uniformity and the policies served by such an approach. It opined:

> Property interests are created and defined by state law. Unless some federal law requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to

reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy."

*Butner,* 440 U.S. at 55, 99 S.Ct. 914 (citation omitted); *see also Nobelman v. American Savings Bank,* 508 U.S. 324, 329, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993) ("In the absence of a controlling federal rule, [the court will] generally assume that Congress has left the determination of property rights in the assets of a bankrupt's estate to state law."). This restrained approach and its underlying rationale has been reiterated by the Third Circuit on several occasions. Recently, the court observed:

> We must approach the task [of ascertaining congressional intent] with the realization that the Bankruptcy Code was written with the expectation that it would be applied in the context of state law and that federal courts are not licensed to disregard interests created by state law when the course is not clearly required to effectuate federal interests.

*Integrated Solutions, Inc.,* 124 F.3d at 492–93 (*quoting In re Roach,* 824 F.2d 1370, 1373–74 (3d Cir.1987) and citing cases in support). "In other words, without explicit federal preemption, the trustee does not have greater rights in the property of the estate than the debtor had before filing for bankruptcy." *Id.* at 493.

■ Consistent with this well-settled approach, the courts have held that under the bankruptcy code "[p]re-emption must be either explicit, or compelled due to an unavoidable conflict between the state and the federal law." *Id.* (*quoting In re Roach,* 824 F.2d at 1373). Because appellants seek to obtain a result that is directly contrary to state property law, their burden is to identify either explicit federal preemption or an irreconcilable conflict between federal and state law.

Appellants' attempt to meet their burden by pointing to § 365 falls well short of the mark. Section 365 provides the debtor/trustee with certain additional rights in "executory contracts and unexpired leases." 11 U.S.C. § 365. Of course, unexpired leases are in themselves a form of executory contracts. *See* Countryman, *Executory Contracts and Bankruptcy: Part 1,* 57 Minn.L.Rev. at 439; *see also* Black's Law Dictionary 898 (7th ed.1999) (A lease is "a *contract* by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration, usually rent") (emphasis added). The statute does not expressly cover other vested interests in real property, let alone those obtained through an executed conveyance. Thus, no basis for express preemption is present.

Nor is there any sound basis to declare § 365 in conflict with Ohio's law on easements. The statute does not draw with in its ambit executed deeds conveying interests in real property, and appellants have not cited any authority applying § 365 to an executed deed. And the court has not found any authority to support such a proposition. An executed deed is merely the remnant documentation of a completed transaction producing property rights.

Because an executed deed is neither an unexpired lease nor an interest that is analogous to an executory contract, the statute does not raise an irreconcilable conflict with the outcome reached under state law. Because appellants have not raised a viable basis for federal preemption, the court is not licensed to interpret § 365 in a manner that fundamentally alters the property interest owned by the debtor on the date of filing. To do so would contravene the well-settled principles governing the interpretation and application of the bankruptcy code. Consequently, appellants' argument that § 365

authorizes the assignment of the Midwest Belt/Storage Facility Easement cannot be sustained.

For the reasons set forth above, the bankruptcy court's Memorandum Opinion and Order dated October 10, 2003, must be affirmed. An appropriate order will follow.

### ORDER OF COURT

AND NOW this 31st day of March, 2005, for the reasons set forth in the opinion filed this day, IT IS ORDERED that the Bankruptcy Court's Memorandum Opinion and Order dated October 10, 2003, be, and the same hereby is, affirmed.